(No. 15544.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EARL QUINN, Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. CRIMINAL LAW—*when affidavits are not sufficient to show the witness was not sworn.* Affidavits of witnesses that the prosecuting witness did not hold up her hand to be sworn when she stood up with the other witnesses are not sufficient to obtain a new trial, where the record does not show that the witness was not sworn and no objection was made at the trial although the defendant and his counsel knew that the oath was being administered.

2. SAME—*statements of jurors cannot be received to impeach verdict.* Statements of jurors, either sworn or unsworn, as to their misconduct, incompetency or previous knowledge of the case can not be considered for the purpose of impeaching their verdict.

3. SAME—*when an instruction as to reasonable doubt will not reverse.* No number of definitions of reasonable doubt will enable the jury to better understand the term, but a long instruction on the subject will not require a reversal where it states the law correctly.

WRIT OF ERROR to the Circuit Court of Jefferson county; the Hon. CHARLES H. MILLER, Judge, presiding.

WILLIAM H. GREEN, and ALBERT WATSON, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, FRANK G. THOMPSON, State's Attorney, and VIRGIL L. BLANDING, (NEIL H. THOMPSON, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Earl Quinn, (herein called defendant,) was convicted in the circuit court of Jefferson county before the court and a jury for the crime of rape and was sentenced to the penitentiary for the term of two years. He has sued out this writ of error to review the judgment.

The prosecuting witness, Maggie Kniffen, of the age of twenty years and weighing about 100 pounds, is a sister of the defendant's wife and at and previous to the commission of the crime charged was employed in a knitting factory at Mt. Vernon, Illinois. She was boarding and lodging with Mrs. George Harvel, rooming with another girl employed at the same factory, Grace Payne. The defendant lived on a farm in the southeast part of Jefferson county, weighed about 145 pounds and was about twenty-five years of age. His father-in-law, Frank Kniffen, lived about a mile north of the defendant, and the defendant's wife was staying at her father's at the time herein mentioned and was in a family way and in a delicate condition of health. The defendant was the father of another child about a year old.

The prosecutrix testified, in substance, to the following: Late in the afternoon of January 16, 1923, she was called from her work in the knitting factory by the defendant, who told her that her father was very sick and that she was wanted at home and that he would take her there in his buggy. She agreed to go with him and they drove to her boarding house, where the defendant told Mrs. Harvel that the witness' father was very ill and that they needed her at home. The defendant and the prosecuting witness left her boarding house about five o'clock P. M. and drove south towards her home, stopping on the way at a store, where the defendant purchased some bread, bologna and candy. When they came to the point in the road where it divided, one road leading toward her father's home and the other toward defendant's farm, the defendant took the one leading toward his farm, giving to her as his reason therefor that her father was at his house. When they arrived at his home he informed her for the first time that her father was not at his home and that what he told her was all a sham to get her down there. She tried to yell, but he put his hands over her mouth. She released herself from his grasp and started to move away from him, and he took a

gun out of his pocket and told her to be quiet and to remain there. She sat in the buggy while he unhitched his horses, and after unhitching them he put them in the barn without taking the harness off them and without feeding or watering them. They then went into the house and into the living room. She sat down in one of the chairs and he tried to take her coat and hat off, and finally she moved away from him and sat on the bed. He then pushed her over and had sexual intercourse with her against her consent, and she only gave her consent because she was afraid to resist him. They remained there until about five o'clock the next morning, when they started for Mt. Vernon in the same buggy they had used the night before but by a longer and different road, which the defendant traveled, as he explained to her, for the purpose of delivering her at the Wabash depot at Mt. Vernon so she could go from there to her boarding place and that the people might believe that she had come to Mt. Vernon from Belle Rive on the ten o'clock train. The defendant left her at the Wabash depot and told her to remain there until the train arrived and to say when she got to her boarding place that she had returned from her home on the train. After he left her she went to her boarding house. She did not tell Mrs. Harvel about what had happened to her but did that day tell her room-mate, Miss Payne, and another young woman, Ruby Melton. Her folks at home were notified about it, and her father came to Mt. Vernon that evening and the defendant was at once arrested upon this charge. She further testified that it was a very cold night when these things happened and that she did not take off her clothes or go to bed with the defendant.

The defendant admitted that he did all the things in Mt. Vernon to get the prosecutrix to go with him that she said he did, and further testified, in substance, as follows: He bought a bottle of medicine and showed it to her and others for the purpose of making the other people believe

313—23

that her father was really sick and that he bought the medi-
cine for him. He testified that the trip to his home had
been planned by himself and the prosecuting witness, and
that previously they had agreed between themselves that he
should do substantially as he had done and tell the prose-
cuting witness and the others the things he told them in
Mt. Vernon so as to give her an excuse to go with him to
his home, and that it was understood by the prosecuting
witness that they were going to his home and that there was
no one else to be there, his wife being at that time at her
father's home. When they got to his house he got out of
the buggy, unhitched his horses, watered and fed them, and
she sat in the buggy while he was doing those things. He
then came back to the buggy and told her that they had
better go into the house; that he got a lap-robe and a heavy
quilt and they went to the house, she carrying the provi-
sions he had bought. He then went out to the woodpile
and got some kindling, and while he was making the fire
she was sitting in a rocking chair and remarked that he
had better put the shades down before he lighted the fire.
He then pulled the shades down in the front of the house.
One shade did not come clear down, and she then asked
him to get a chair and put it by the window and put the
lap-robe on it; that he went about building the fire, and she
got up and put the lap-robe on a chair and pulled the other
shades down so that the light would not shine out through
the window. They sat down for a time until the fire got
started and then ate their lunch together, she having got-
ten the bread knife and prepared the lunch. She then got
on his lap at his invitation, and they held one another's
hands and loved each other for quite a while. Finally she
said they had better go to bed right away as they had to
get out of there pretty early the next morning, and they
both undressed and she ran and jumped in the bed first and
then he got in bed with her, and that her statement that
she sat in the chair all night was untrue. They had sex-

ual intercourse the next morning after they awoke and got up about 4:30. She prepared a little breakfast of Post-toasties and minced ham and spoke about not getting the dishes dirty. Then he went out and hitched up the horses and she cleaned and put away the dishes. They tried to leave everything just like they found it. They started back for Mt. Vernon at half-past five in the morning. He further testified that he had previously taken indecent liberties with her and had had sexual intercourse with her on at least three different occasions,—twice in Mt. Vernon, one time at the Grand Hotel and the other at the Columbia Hotel; that she went to each place with him voluntarily, and that he registered them as man and wife and took a room at each place with her. The other time that he stated he had intercourse with her was out in the country near their home while taking a ride together in a buggy. He denied positively that he made any threats or used other means of intimidation for the purpose of accomplishing the act of sexual intercourse with her at his home on the night in question and denied displaying to her a gun for that purpose, although he admitted that he had a gun that night and told her that she might use it while he was putting up and feeding his team if anyone should attempt to bother her. He told her that because she expressed a fear of remaining alone.

The only corroboration of any act of sexual intercourse between the parties previous to the night of the alleged crime was the testimony of one of the defendant's brothers-in-law, who testified that as he was galloping his horse by the Columbia Hotel one morning about seven o'clock in January, 1921, he saw the defendant come out of the hotel with the prosecuting witness and that he hailed the defendant as he galloped by him and her. His evidence showed that he had never previously known the prosecutrix or had any acquaintance with her, and he could not describe any part of the clothing that she had on that morning. The

only thing that he was positive about in that regard was that she had on a hat. The defendant was corroborated by the proprietor of the Columbia Hotel, to the effect that he had stayed all night with some woman in January, 1921, but he could not identify the prosecutrix as the woman.

The prosecutrix denied *in toto* the testimony of the defendant that he had taken indecent liberties with her or that he had at any time previous to the night of the alleged crime had sexual intercourse with her. She produced other witnesses tending to show that she was not in Mt. Vernon in January, 1921, at the time he claimed to have had sexual intercourse with her at the Columbia Hotel, and proved positively that her employment at the knitting factory did not begin until April, 1921. There is some testimony in the record to the effect that she visited Mt. Vernon a few times previous to her employment at the knitting factory and that on one occasion the defendant and his wife went to Mt. Vernon with her, but her testimony is to the effect that she was not out with the defendant at any time she was in Mt. Vernon, and the statements of other witnesses tend to corroborate her in this claim. The State also introduced witnesses who testified to voluntary statements made by the defendant to them, one of which was to the effect that he told the deputy sheriff that he took the prosecutrix down to his home but only stayed there a little while with her and did not do anything to her. To another witness, in referring to the occurrences at his home, he stated that the prosecuting witness did not know anything about what occurred there, and gave as his reason that she had fainted. The defendant positively denied making these statements.

The story told both by the prosecutrix and the defendant as to their trip to the defendant's home on that night and what occurred there are indeed very unusual, if not remarkable. It is rather difficult for the human mind to believe the entire statements of either the prosecutrix or the defendant as to just what occurred on the night in question

and on the previous occasions the evidence shows they were together, but this is not unusual in the trial of parties charged with extraordinary and revolting crimes. The jury and the court heard the evidence given in this trial, and they were in a much better position to determine the question whether or not the defendant was proven guilty beyond a reasonable doubt, as required by the law, than this court can possibly be. The corroborative evidence of the prosecutrix is very much stronger than that of the defendant. The story of the defendant in a great measure discredits him. He is also discredited by the testimony of other witnesses. The evidence in this record sustains the verdict of the jury and the trial court has sustained it, and this court would not be warranted in doing otherwise. The main contention of the defendant is that the judgment should be reversed on the evidence, alone, but after weighing it carefully this court cannot sustain that contention.

Another contention of the defendant is that the prosecuting witness was not sworn to testify in the case. The record shows that she was so sworn. The affidavits of the witnesses made for the purpose of obtaining a new trial state positively that she stood up with the other witnesses at the time they were all sworn but to the best of their judgment she did not hold up her hand when the oath was administered. There is no showing in the record that the defendant and his counsel did not know this at the time the oath was administered, if it is possible that she did not hold up her hand. No such objection was made on the trial. Under the holdings of this court the facts shown in the record cannot be overcome by the affidavits of witnesses. There is no theory upon which we can hold with the defendant on this contention.

Another contention is that a new trial should have been granted because one of the jurors was disqualified because of the fact that he knew all about the surroundings and windings of a certain swimming hole in which the defend-

ant claimed to have taken indecent liberties with the prosecutrix. The juror filed his affidavit to the effect that he was very familiar with the surroundings and windings of the creek at the swimming hole. The affidavits of other persons were filed, in substance stating that they heard the juror say that he did not know at the time he was examined as a juror that the swimming hole would play an important part in the trial; that he knew all about the swimming hole, and that when the evidence was offered as to the alleged event that occurred between the prosecutrix and defendant at that place, by reason of his knowledge the case was virtually tried by only eleven jurors. These affidavits furnish no ground for a new trial. This court has repeatedly held that the statements of jurors, either sworn or unsworn, as to their misconduct or their incompetency cannot be considered for the purpose of impeaching the verdict. *City of Chicago* v. *Saldman,* 225 Ill. 625.

As to the contention of the defendant that the court erred in giving instructions for the People, our conclusion is, after examining all of the instructions, that the law of the case was fully stated to the jury. Some of the instructions are inaptly worded. One of them, or the substance of it, is repeated in another. There was a very long instruction on reasonable doubt, containing five or six numbered propositions. The instruction is a stock instruction commonly given by trial courts, every part of which states the law correctly. We still adhere to our contention that no number of definitions of reasonable doubt will enable the jury to better understand that term, and still adhere to our rule that we will not reverse a judgment for the giving of such instructions where not numerous and where the instructions given state the law correctly. We do not believe the defendant was prejudiced by the giving of any or all of the instructions in this case.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*