THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
NOLA JEAN WEAVER, Defendant-Appellant.

Second District No. 79-5

Opinion filed November 5, 1980.—Rehearing denied December 18, 1980.

Ronald F. Neville, of Neville, Pappas & Mahoney, of Chicago, for appellant.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, an Elk Grove High School physical education-dance teacher, was indicted January 17, 1978, on two counts for the December 5, 1977, murder of her husband, Larry Weaver, who was an assistant school district superintendent. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a).) Defendant was found guilty of murder by a jury, and received a sentence of 40 to 60 years after electing to be sentenced under the old code. Defendant's $250,000 bond was revoked upon sentencing and she is presently incarcerated. Sixteen issues were raised on appeal. We discuss only three of those issues, and reverse and remand on the basis the defendant did not receive a fair trial.

The record disclosed that at approximately 1:30 a.m. on December 5, 1977, defendant's next-door neighbor, Cindy Goodfellow, was awakened by a constant, loud, rapid knocking on her front door. It was the defendant, clad only in a nightgown, carrying over her shoulder and under a blanket her nine-year-old daughter, Tiffany. Mrs. Goodfellow described the defendant as "full of panic and scared to death." Defendant said: "There is a fire. Call the fire department and the police." Defendant also said there were men at her house with guns. Looking out of her window, Mrs. Goodfellow did not see any fire nor men in the house, which was all dark. Police and fire units arrived, and police with flashlights entered the Weaver home first, gaining access through the slightly ajar sliding glass door from which the defendant had fled her house. Police smelled a slight odor of smoke upon entering the Weaver home and proceeded down the hall to check the bedrooms, all of which had open doors except the master bedroom. The master bedroom door was hot to the touch, and the police resummoned the fire units, some of which had already left the scene. The master bedroom was ventilated by breaking a window from the outside and fireman entered the room. Entry to the bedroom occurred approximately 45 minutes after the original call was made from the Goodfellow home. There was smoke, and the bed was observed to be a glowing, smoldering object which was extinguished with a hand-held extinguisher and a stream of water from a 1½-inch fire hose. The body found in the bed was identified through dental charts as the defendant's husband. He had been shot in the head, and the near contact wound

found near his left temple was determined to be the result of a .22-caliber copper-covered bullet. Death was testified to as having been instantaneous. He suffered second and third degree burns from the fire which occurred anywhere between one minute to one hour after his death. The exact cause of the fire was not discovered, nor was it determined if an accelerant had been used.

The State presented evidence and photos in support of its theory that the deceased was in bed, under the covers and asleep at the time he was shot. Testimony from a pathologist during trial indicated he was unable to determine what position the deceased was in when he was shot. Damage from the fire was most extensive on the lower left-hand side of the bed, the side where the body was found. The fire and heat caused various degrees of charring and melting to other items in the room and caused plastic ceiling tiles in the master bedroom to fall to the floor.

No weapon or ammunition was found in the house, although there was testimony that the deceased owned a .22-caliber rifle. All doors in the house were found locked from the inside, except the door Mrs. Weaver had exited. The doors equipped with dead bolt locks were dead-bolt locked. There were no signs of tampering with the doors or windows, nor were there any signs of ransacking in the house. The double automatic garage doors were in the down position, and both of the Weavers' cars were in the garage. The engine block of the blue car usually used by the defendant was warm; the other car was cold. The garage was an unheated one. There was water on both front seat floor mats in the blue car, and the seat was in the full forward position. Mr. Weaver was 6 feet tall; Mrs. Weaver is approximately 5 feet 7 inches tall. The defendant's purse and car keys were found on a counter near the door leading to the garage. The car had been used earlier during the evening of December 4 at about 7 p.m., when Mr. Weaver used the defendant's car to pick up Tiffany at choir practice. The Weaver house was in Long Grove and the surrounding area consisted of many open fields and farming area. The defendant gave police a description of the two alleged home invaders and composite sketches were made. The record indicates there was possibly an identification as the result of the composites, but the State's hearsay objections were sustained and defense counsel was unable to elicit testimony on this point.

The State advanced the theory that defendant's motive was that she was discontent in her marriage and had had an affair with her boss at school, Robert Tipsword. Further she was frustrated by her husband in trying to carry on a relationship with her brother-in-law, Dennis Johnston. Additionally, the State presented testimony relating to the existence of other possible motives such as deceased's life insurance policies and employment death benefits; his will; the value and joint tenancy of their

home; past moneys received by him from his father; the Weavers' condominium in Florida; property owned by his mother and father in Arkansas, and his potential inheritances. The theory was that financial gain may have provided an alternative motive for the murder, or at least, that this financial state of affairs did not present any hindrance to the murder.

The defense presented no witnesses, and made numerous motions for mistrial for various reasons. All were denied, as were motions for a directed verdict and post-trial and supplemental post-trial motions.

We begin our consideration of this appeal with the defendant's contention that reversible error occurred due to the failure of the State to supply defense counsel with certain discovery prior to trial. Pat Weaver, the deceased's sister, testified at trial that shortly after Christmas of 1977, when the defendant was in Magnolia, Arkansas, the deceased's mother asked the defendant if she had had an affair with Robert Tipsword and whether Larry (the deceased) and Tipsword's wife, Winifred, knew about it. The witness testified the defendant answered affirmatively to both questions. She further testified she later talked to Winifred, who denied knowledge of the affair, and that the defendant later recanted her statement that Larry knew about it.

Defense counsel asked either that Weaver's testimony be stricken or that a mistrial be declared since the fact of defendant's admission as testified to by Pat Weaver was not provided to defense counsel prior to Weaver's testimony pursuant to Supreme Court Rule 412. (Ill. Rev. Stat. 1979, ch. 110A, par. 412.) The Assistant State's Attorney admitted in chambers that this was true, and that she could have let defense counsel speak with the witness out in the hall, but that she "just didn't think about it." She added that defense counsel had not asked to speak with the witness even though she was available. Defense counsel stated he thought he already knew what her testimony was going to be based on the discovery he had received from the State relative to this witness.

Pat Weaver testified the State had general knowledge of the substance of this admission approximately two to three weeks before trial, and the Assistant State's Attorney stated in chambers she knew the exact details of the admission when the trial began on October 18, 1978, which was a week before Weaver actually testified on October 25. At no time prior to this witness' testimony was defense counsel made aware of the extremely damaging nature of the testimony to be given.

■■ An admission is a statement of independent facts which, when taken in connection with proof of other facts, may lead to an inference of guilt of the crime charged, but from which guilt does not necessarily flow. (*People v. Walters* (1979), 69 Ill. App. 3d 906, 919.) Although failure to disclose exculpatory information is quite serious, failure to disclose information which is inculpatory in nature before actually presenting it in open

court in front of the jury can be far more damaging, for it presents defense counsel with the almost impossible task of rebutting, or at least neutralizing, his client's own statement. Such a task is particularly more difficult where the information is received after the trial has progressed for a considerable amount of time and where the decision not to have the defendant testify likely has already been made. When such is the case, defense counsel can only rebut or neutralize the inculpatory statement through cross-examination and appropriate jury instructions, both of which are integrally related to the theory of defense and require extraordinarily careful preparation in order to be effective.

When evidence against a defendant for murder is circumstantial, proof beyond a reasonable doubt requires the exclusion of every reasonable hypothesis of innocence that is consistent with the defendant's innocence. (*People v. Howard* (1979), 74 Ill. App. 3d 870.) Not surprisingly, any reasonable hypothesis of innocence is likely to be discounted progressively by degrees as evidence of possible motives compounds. The State avidly posited that the defendant's murder motive was her marital discontent as evidenced by her seven-year affair with Robert Tipsword, and that the deceased's interference with the defendant's alleged relationship with her brother-in-law, Dennis Johnston, was, in effect, the last straw for the defendant and the actual impetus for murder. However, the time of and duration of the defendant's alleged affair with Tipsword was never established by the evidence to be either proximate in time to the murder or of a seven-year duration. The prosecutor included this reference in closing argument improperly. The only mention of a seven-year duration was made in chambers when the parties argued, and the defense was granted, a motion *in limine* regarding a conversation Winifred Tipsword had with the defendant after she had been charged with the murder of her husband and advised by her attorney not to speak with anyone about it. Further, because Pat Weaver had testified the defendant said Winifred Tipsword knew about the affair, Tipsword was allowed to answer the following question for the purpose of showing her "knowledge" of the affair, rather than the "truth of the matter asserted":

"Q. Did you know prior to December 14, 1977, that your husband was having an affair with Jean Weaver?

A. No, I did not."

Since Winifred allegedly had known about the affair "since last summer," according to Pat Weaver's testimony, the prosecutor's reference to the specific date of December 14 did a great deal more to show the truth of the matter asserted than it did to show Winifred's knowledge of the affair as of the previous summer. The form of the prosecutor's question was tantamount to the classic question "When did you stop beating your wife?" because it assumed as true a fact to which the witness

had not testified, and called for a "negative pregnant" response; *i.e.*, a denial in such form as to imply or express an affirmation of a substantial fact which is controverted. Upon defense counsel's objection to the question, the prosecutor argued that fact of an affair was already in evidence because of Pat Weaver's testimony about the defendant's alleged admission, and the court overruled the defense objection.

Dennis Johnston's testimony about his alleged infatuation with the defendant was hostile, qualified, and ambiguous. On the State's motion, he was designated a court's witness. By itself, Johnston's testimony may or may not have been convincing enough to cause the jury to believe the defendant did, in fact, have an emotional or other relationship with her brother-in-law which was intense enough to constitute the actual impetus for the murder. When cumulated, however, with the knowledge that the defendant herself allegedly admitted to yet another previous or possibly co-existent extramarital relationship, and—as a consequence of that revelation—with Winifred Tipsword's corroboration thereof, it is difficult to see how the jury could discern any saving grace for the defendant whatsoever. Thus, the tiny seed of prejudice planted by the State's initial violation of the court's discovery order, and fertilized by corroboration, was incubated to immoderate probative strength in the human passions of the jury.

■■ We conclude the State's failure to provide the defense with discovery of the defendant's alleged admission prior to Pat Weaver's testimony was prejudicial reversible error and that the defendant was denied a fair trial thereby. Just as we do not conjecture to what use a defendant's counsel would put withheld exculpatory evidence (*People v. Parton* (1976), 40 Ill. App. 3d 753, 758), neither do we speculate as to how defense counsel may have handled the defendant's alleged admission, nor whether he would have been successful in keeping this prejudicial information from the jury. We only conclude that the withholding in this case resulted in undue prejudice to the defendant, which denied her a fair trial and effective assistance of counsel.

Supreme Court Rule 415(g)(i), (ii) (Ill. Rev. Stat. 1979, ch. 110A, par. 415(g)(i), (ii)) permits procedural and personal sanctions for failure to comply with discovery orders of the court thusly:

"(g) Sanctions.

(i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances.

(ii) Wilful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court."

■■ Although the judge specifically stated he did not feel the discovery was withheld intentionally, we question how the State could have "overlooked" the alleged admission "in the heat of battle" considering the chronology of events. The Assistant State's Attorney admitted in chambers she knew generally that the defendant had admitted to the affair about three weeks prior to trial, but that she did not know the "exact" details of the conversation until the witness arrived in town at the beginning of the trial on October 18. Pat Weaver was called to the stand on the sixth day of the trial (October 25) immediately after the defendant was granted a motion *in limine* in chambers as to the statements made by the defendant during her meeting with Winifred Tipsword which the State unsuccessfully sought to characterize as an admission. We wish to emphasize our view that noncompliance with discovery orders requires more than a casual assessment of the willfulness of the offending party. Parties who intentionally disregard discovery orders of the court must be sanctioned severely enough to assure that the underlying purpose of the sanction power—to compel compliance, not punish (*People v. Anderson* (1980), 80 Ill. App. 3d 1018)—is preserved.

As a result of the discovery failure, the court here stated that the defense counsel would be allowed time to speak with witness Weaver, and then be permitted to re-cross-examine her. We observe that in criminal proceedings, pretrial discovery is essential in order to provide the defendant with protection against surprise, unfairness, and inadequate preparation, as well as to afford the defense an opportunity to investigate the circumstances surrounding the alleged statement. (See *People v. Shegog* (1976), 37 Ill. App. 3d 615.) The duty of the State to disclose to the defendant "the substance of any oral statements made by the accused" (Ill. Rev. Stat. 1979, ch. 110A, par. 412(a)(ii)), is a continuing one, requiring prompt notification of defendant of the discovery of any additional material or information, up to and during trial. (Ill. Rev. Stat. (1979), ch. 110A, par. 415(b).) It is obvious the State breached its initial, as well as its continuing, duty to disclose the substance of the defendant's admissions to witness Weaver. We determine that the curative sanction imposed by the trial court was insufficient to assure the defendant a fair trial, and that an abuse of judicial discretion occurred thereby.

Because we do not know to what degree more effective counsel may have been afforded defendant if the State's breach had not occurred, we cannot conclude that the failure of discovery did not contribute to the jury's guilty verdict, or that the additional cross-examination opportunity afforded by the court was just under the circumstances, particularly in

light of the increased importance of existence of a motive where the case otherwise is based on circumstantial evidence. In sum, we cannot view the error as harmless beyond a reasonable doubt, and conclude the defendant is entitled to a new trial.

The next of defendant's contentions which we consider has merit and requires that the defendant be tried anew concerns the court's failure to poll the jury about prejudicial newspaper, radio, and television reports. To place the issue in perspective, we note that jury selection began on October 16, 1978. On October 17, after some of the jurors had been selected, defense counsel apprised the court of an October 17, 1978, article which appeared in the Arlington Heights Daily Herald, and orally moved for a disqualification of the entire venue and a change of venue. Although the Assistant State's Attorney agreed that the article contained "some glaring inaccuracies" and he could "understand the defense's position that they consider the article highly prejudicial," he objected to the motions. The State's objection was on the grounds that there was no showing any of the jurors had been "poisoned" by the article, the paper is primarily circulated in the extreme southwest portion of the county, the entire venire had been admonished by the court the night before not to read anything about the case, and the oral motion for change of venue was insufficient in that form. After reading the article, the court denied both motions.

Jury selection then continued on the 17th of October and during the morning of the 18th. The trial began during the afternoon of the 18th. At the conclusion of the proceedings on the 18th, the trial judge neglected to admonish the jury not to avail themselves of any media concerning the trial, although he had conscientiously done so previously and did so subsequently.

On the morning of October 19, the second day of trial, defense counsel moved that the judge interrogate the jury regarding newspaper (The Chicago Tribune, The Sun-Times, and the Arlington Heights Herald, Paddock Papers), radio and television coverage (Channels 5, 7, and 2) of the trial.

Although the news articles were not offered into evidence nor made a part of the record, the record is reasonably clear that the articles were produced in chambers, and were available for review by the judge. From the discussion which ensued as reported in the record, it is apparent to us that the court did not review the allegedly prejudicial articles at that time, nor did he indicate he had seen them earlier. This fact distinguishes the case at bar from *People v. Heller* (1971), 131 Ill. App. 2d 799, cited by the State, which held that the appellate court should assume the trial court acted properly in not polling the jury where the prejudicial item is neither produced nor abstracted. However, in *Heller*, the court acknowledged

reading the article in question. Defense counsel stated that television Channel 7's reporter, Jay Levine, was attempting to get interviews from either the parties, or the members of the jury, as they left the building the late afternoon of October 18, and that at least one of the jurors appeared on the television screen. Because the court asked whether or not the juror was talking to the reporter, we infer he did not see that particular T.V. coverage, nor did he indicate he had seen or heard any of the other television or radio broadcasts. In the absence of a showing by defense counsel that one of the jurors had violated the admonishment of the court as far as reading or talking to anyone about the case, the court declined to interrogate the jurors.

The question of whether a jury should be interrogated with respect to a given newspaper article rests in the exercise of the sound discretion of the trial judge. It is the improper exercise of that discretion by the trial court that is error, not the refusal to interrogate the jury. (*People v. Murawski* (1946), 394 Ill. 236; *People v. Cox* (1966), 74 Ill. App. 2d 342.) As stated in the latter case:

"This does not imply that every newspaper article published during trial requires an interrogation of the jury. Its nature, content and prejudicial effect, if any, is to be resolved by the trial court in an exercise of sound discretion. The article must be produced and made a part of the record and its prejudicial effect, if any, first carefully explored by the trial court." (74 Ill. App. 2d 342, 347.)

The court also stated:

"It is clear that the determination to be made by the trial court rests not alone on what the jury says on interrogation, but the nature of the published material together with all other facts and circumstances in the record." 74 Ill. App. 2d 342, 346.

■■ The true error which occurred in the case at bar, and we believe it was reversible error, is not that the judge refused to interrogate the jury. Error on this point is indeterminable considering the absence of even an abstract of the alleged prejudicial articles and broadcasts. The error *occurred when the court failed even to look at the newspaper articles* that were produced in chambers to determine whether their "nature, content and prejudicial effect," together with all the other facts and circumstances of the case, necessitated that the jury be polled. Due to the aura of notoriety surrounding this case, and the sensational nature of the murder motive advanced at trial, the potential for undue prejudice was great, and was significantly enhanced by the fact that the publicity complained of appeared not only in a local suburban paper which may have had relatively limited circulation, but in city papers, and on major television and radio networks. An immediate sequestration of the jury would have prevented possible future prejudice, but would not have served to

discover whether prejudice had already been produced by the media coverage. In contrast, a poll of the jury is designed to uncover the presence of such media taint as soon as it occurs, so that appropriate purging measures may be taken.

We do not believe this issue may be disposed of summarily on the basis that defense counsel failed to make the allegedly prejudicial articles a part of the record, for this only goes to whether or not the judge was correct or incorrect in his assessment of the possible prejudicial effect of the media coverage. As set forth in *People v. Cordova* (1980), 83 Ill. App. 3d 147, 149:

> "[T]he trial court is required to make a two-part analysis when an allegation of prejudicial publicity is raised. Step one is a consideration of the nature of the publicity, its content and its potential for prejudice. [Citation.] If the trial court determines the publicity is not prejudicial, there is no need to poll the jury. [Citation.]"

In the instant case, judicial discretion was abused first and foremost by the judge's failure to perform step one before making the decision whether or not to proceed to step two, a poll of the jury. Since we do not know to what extent, if any, the jury may have been influenced by this media, nor whether the defendant may have been prejudiced thereby, we cannot conclude the error was harmless beyond a reasonable doubt.

The last of defendant's contentions which we consider here also concerns the defendant's right to trial by a fair and impartial jury. Specifically, the affidavit of the defendant's co-counsel which was appended to the defendant's supplemental post-trial motion detailed how he had received a phone call from an anonymous informant (later identified) who related that her friend, Mrs. X, worked for Mr. Y, who told her that his boss, who was the Weaver jury foreman, talked with him at length about the case prior to the time he sat on the jury. Mrs. X, fearful that both she and Mr. Y would lose their jobs if called upon to testify about the discussion, called the informant "every name in the book, including a traitor" when the informant divulged her plan to inform defense counsel of the discussion, and Mrs. X refused to talk with defense counsel. The defendant's supplemental post-trial motion alleged that the jury foreman had prior knowledge of the facts and circumstances of the case which he failed to disclose to the court during voir dire examination, that he had pre-determined feelings or knowledge as to the guilt or innocence of the defendant, and that the defendant was thereby deprived of her right to trial by a fair and impartial jury. Defendant prayed that the court order the informant to divulge Mrs. X and Mr. Y's names so that a hearing could be held to determine the truth or falsity of the allegation. According to the record of the jury foreman's voir dire, the only

discussion he had concerning the case was with his wife who worked with a woman who was a neighbor of the defendant, but that his wife had related only "generalities." Defense counsel argued during the post-trial hearing that if the juror had indeed discussed the matter as alleged in the affidavit, then he had not been truthful during voir dire and, if defense counsel had known about the additional discussion, he may not have selected him as a juror.

The State argued and the court commented repeatedly that the affidavit was based on hearsay and would neither support the grant of an evidentiary hearing or a new trial. (*People v. Brinn* (1965), 32 Ill. 2d 232, *cert. denied sub nom. Clements v. Illinois* (1965), 382 U.S. 827, 15 L. Ed. 2d 72, 86 S. Ct. 62; *People v. Pugh* (1977), 49 Ill. App. 3d 174; *People v. Gamboa* (1975), 30 Ill. App. 3d 242), and that the general rule is that jurors may not impeach their own verdict. (*People v. Holmes* (1978), 69 Ill. 2d 507, 511; *People v. Weger* (1962), 25 Ill. 2d 370; *People v. Quinn* (1924), 313 Ill. 351.) Defense counsel acknowledged this was indeed the law. Nevertheless, he reiterated that his desire at that time was only to secure the court's order to get the informant into court to determine who the witnesses were so that they could testify as to their knowledge which, in turn, would either provide defendant with sufficient facts to support a motion for a new trial based on that error or put an end to the proceedings.

Had such information been presented to the trial court during trial, the judge most surely would have questioned the juror concerning the allegations. We believe the accomplished fact of the defendant's conviction more clearly should have compelled the court to discover the truth or falsity of the allegations against the juror by ordering the informant to divulge the names of the parties involved. We believe that *People v. Brinn* (1965), 32 Ill. 2d 232, cited by the State, may be interpreted to support the defendant's assertion that a hearing should have been granted, because it is clear that in the instant case defense counsel's associate did in fact interview the informant and tried to secure Mrs. X's attendance at court. ■■ It is clear defense counsel was not asking the court to grant a new trial on the basis of the affidavit; he was merely asking the court to order the informant to give him the information he needed which would possibly support a new trial motion based on this issue. Further, defense counsel was not attempting to impeach the verdict by showing the jury used improper methods or faulty reasoning in reaching the verdict; his motion was directed to a determination of whether or not one of the jurors possessed a disqualifying state of mind prior to sitting on the jury. We believe he should have been allowed to make this determination and that it was error for the court to refuse to order the informant to divulge the names. In view of the fact that the failure to accord an accused a fair hearing violates even the minimal standards of due process (*People v.*

*Cole* (1973), 54 Ill. 2d 401), questions of defendant's right to a trial by a fair and impartial jury cannot be disposed of by the harmless error rule. (*People v. Oliver* (1977), 50 Ill. App. 3d 665.) Accordingly, the cause must be reversed and remanded for a new trial.

Defendant has also raised the question of the sufficiency of the evidence. The Illinois Supreme Court has determined it is error for an appellate court to reverse a criminal conviction and remand for a new trial without deciding defendant's contention that the evidence at the first trial was insufficient, since failure to so decide risks subjecting the defendant to double jeopardy. (*People v. Taylor* (1979), 76 Ill. 2d 289, 309.) Acknowledging that when the State's evidence is circumstantial, proof beyond a reasonable doubt requires the exclusion of every reasonable hypothesis, based on the evidence or on the absence of evidence, which is consistent with the defendant's innocence (*People v. Howard* (1979), 74 Ill. App. 3d 870), our review of the record shows the evidence was sufficient to find the defendant guilty of murder beyond a reasonable doubt. There was a dearth of evidence which would have been consistent with defendant's defense that two armed home invaders murdered her husband. The evidence which would have been consistent with defendant's theory consisted primarily of these circumstances: One of the police officers originally responding to the Goodfellow call allegedly saw footprints around the Weaver home in the light snow cover, and told the evidence technician who arrived later about this, but no casts of the prints were made; although all the other doors in the house were locked from the inside, the invaders could have exited the house either via the sliding glass door through which the defendant fled the house with her daughter, or via the automatically operated garage doors. In this respect, we note that proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Williams* (1977), 66 Ill. 2d 478.) Despite our determination that the evidence was sufficient to convict, defendant did not receive the fair trial to which she was constitutionally entitled. Therefore, her conviction for murder is reversed and the cause is remanded for a new trial.

Reversed and remanded.

SEIDENFELD, P. J., and NASH, J., concur.