THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER CROWDER *et al.*, Defendants-Appellants.

Second District    Nos. 79-143, 79-199 cons.

Opinion filed July 29, 1981.—Rehearing denied September 29, 1981.

Francis E. Andrew, Lawrence J. Suffedrin, and Mark W. Solock, all of Andrew and Associates, Ltd., of Chicago, for appellants.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendants, Walter Crowder and Jack Brewer, appeal from a jury verdict in the Circuit Court of Winnebago County, finding them guilty of theft of property having a value exceeding $150 in connection with the theft of a Corvette automobile. Ill. Rev. Stat. 1977, ch. 38, par. 16—1.

In response to a wave of car thefts, members of the Rockford Police Department and the Winnebago County Sheriff's Department established a surveillance post on the fourth floor of the local Ramada Inn. On the evening of March 17, 1978, they observed a blue Dodge van drive into the motel parking lot and pull up alongside a light-colored Chevrolet Corvette. The Corvette was owned by a guest of the motel. One of two occupants of the van was seen crouching beside the Corvette. He returned to the van and the second individual got out and entered the Corvette. Both vehicles then exited the parking lot.

An officer at the scene identified defendant Crowder on the basis of photographs he had seen earlier. A description of the vehicles and suspects was transmitted on the police radio. They were initially followed by the police but then managed to slip away.

One policeman who received the radio transmission was Tom Owens, who earlier had followed the suspects to the Ramada Inn. When he received word of the theft, he immediately drove to the farm of defendant Crowder and stationed his car with the lights out on the road in front of the farm. Owens testified that soon afterward a Corvette fitting the description of the stolen vehicle veered around his car, crossed a ditch and drove into a shed which was attached to a barn on the property. Although the Corvette's lights were out, Owens stated that he was able to read the license plate by the light of the moon reflected off the snow as the vehicle passed his. Moments later, defendant Crowder arrived at the farm in the van and was arrested by Owens.

Another officer who answered the police report, Layne Aden of the Cherry Valley police department, was stationed on the other side of the barn from Owens when the Corvette pulled into the shed. Aden testified that he saw defendant Brewer run from the shed toward the farmhouse, ignoring Aden's command to stop. Proceeding to the front of the shed, Aden shined his flashlight through the open doors and saw the Corvette whose color and license number matched those of the stolen car. According to Aden, the vehicle was actually parked beyond a second set

of doors from the shed to the barn which had also been left open, and could not be seen without the aid of a flashlight.

From the shed, Officer Aden proceeded to the farmhouse where he assisted Officer Owens in the arrest of Brewer. They searched the house for additional suspects and then returned to the barn where other officers had turned on the lights and were examining the Corvette. Owens copied down the license number. While he was in the shed he also observed engine parts and a piece of another Corvette body lying beside the wall. Officer Aden leaned a ladder against a loft in the barn, climbed up and discovered some motorcycle fairings.

At approximately 8:30 a.m. a search warrant arrived at the farm which authorized the police to search the entire premises, including the house and out buildings, for the Corvette, other stolen automobiles, tools or keys for entering automobiles, titles or blank automobile titles, records of automobile sales and "other evidence of the offense of theft."

The warrant was issued pursuant to two affidavits, the first attested to by Charles Williams, a special deputy, and the second by Officer Owens. In his affidavit, Williams stated that he observed the theft from the stake-out at the Ramada Inn and recorded the license numbers of the Dodge van and Corvette which he relayed to the Winnebago County Sheriff's Department. Owens stated that he had followed the Dodge van on the night of the 17th and identified defendant Crowder as the driver; that he saw the van enter the Ramada Inn parking lot; that he was advised by Winnebago County Public Safety Communications that the Corvette had been stolen by an individual in the van; that he drove to the Crowder farm and observed the Corvette enter a shed on the property and the driver run into the house; that he arrested defendant Crowder when he arrived driving the van and then arrested defendant Brewer in the house; that in the previous 2 months, 18 Corvettes had been stolen in the Rockford area with no subsequent arrests; that he had observed Crowder looking at other Corvettes on 5 previous occasions and that 3 of those cars were later reported stolen; and that after arresting Crowder and Brewer he saw another dismembered Corvette in the shed.

Warrant in hand, the police seized the Corvette, van and all contents thereof. In addition, more than 175 items ranging from tires and tools to records, fireworks and a pickup truck were taken.

Defendants' motion to suppress the physical evidence was denied after a hearing. Among the items taken, only photographs of the Corvette, Dodge van, and their contents were used at trial.

I

■■■ It is fundamental that searches conducted "without prior approval by a judge or magistrate are *per se* unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated exceptions." (*Katz v. United States* (1967), 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514.) Further, when a search warrant is grounded upon information which itself was the product of a prior illegal search, the warrant should be quashed and the evidence suppressed as "fruit of the poisonous tree." (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) It is defendants' contention that because the initial search of the Crowder farm was illegal, the warrant which subsequently issued on the basis of that search should have been quashed and the physical evidence suppressed at trial. The State, on the other hand, would justify the warrantless intrusion on the grounds that the circumstances of this case fall within the protective scope of either of two exceptions to the warrant requirement: first, that the search was incident to a lawful arrest, and second, that the evidence was in plain view when discovered.

In *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034, the Supreme Court delineated the permissible scope of a search incident to arrest as the area within the "immediate control" of the arrestee, *i.e.*, "the area from within which he might gain possession of a weapon or destructible evidence." (395 U.S. 752, 763, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040.) By its terms, this exception is therefore delimited by the exigencies of the arrest to those circumstances wherein there is a significant danger that either the police officers' lives or evidence of the crime is in jeopardy. In the instant case, both Brewer and Crowder were in custody at the time Officer Owens searched the house and barn. The Corvette was not within the "immediate control" of the defendants and there was thus no danger that it would be destroyed. Furthermore, there is no basis in the evidence for the suggestion that the lives of the policemen might have been endangered by confederates hiding elsewhere on the farm. See *Warden v. Hayden* (1967), 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642; *Simms v. Reiner* (N.D. Ill. 1976), 419 F. Supp. 468.

■■ However, the reach of the search incident to arrest exception to the warrant requirement can be expanded when used in conjunction with the plain view doctrine. As explained by Justice Stewart in *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038:

> "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search

directed against the accused—and permits the warrantless seizure."

Thus, by means of this doctrine, where the initial entry of a policeman upon property for purposes of making an arrest is justified, and the subsequent search of the arrestee appropriately limited, the officer can seize evidence in plain view even though such evidence is not within the "immediate control" of the suspect. (403 U.S. 443, 465-66 n.24, 29 L. Ed. 2d 564, 582-83 n.24, 91 S. Ct. 2022, 2038 n.24.) It is important to remember, however, that in order to invoke the plain-view doctrine the evidence must be seen by an officer who is in a place where he has a right to be. *Harris v. United States* (1968), 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992.

Applying these standards, a significant question is raised with respect to Officer Aden's presence without a warrant on the Crowder farm in anticipation of defendants' arrival. It is by no means clear that his intrusion onto the property could be justified on the grounds of "hot pursuit" (*Warden v. Hayden*), or to effect an arrest, since his entry preceded that of the defendants who he had reason to know were not yet there. (*Cf. United States v. Phillips* (9th Cir. 1974), 497 F.2d 1131 (police entry of private office to arrest defendant improper in the absence of probable cause to believe defendant was there at the time); see also 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §6.1 (1978).) However, in light of our conclusion below with respect to the propriety of Officer Owens' conduct, we need not decide this question.

■■ Unlike Aden, the Corvette was first observed by Officer Owens from the road outside the farm, *i.e.*, in a public place where he had a lawful right to be. Even if we discount his testimony that he could read the license plates of the Corvette by the light of the moon (*cf. People v. Coulson* (1958), 13 Ill. 2d 290, 179 N.E.2d 96 (reviewing court not bound by testimony contrary to law of nature or universal human experience)), his identification of the vehicle as it passed him and entered the shed, based upon its distinctive design and light color, as the same Corvette which had been reported stolen and headed in the direction of the Crowder farm only minutes earlier on the police radio was reasonable. Probable cause to arrest may be based upon knowledge received from a police radio call. (*People v. Sanford* (1980), 85 Ill. App. 3d 1010, 407 N.E.2d 810.) Owens' "hot pursuit" of the suspect onto the property thereafter for purposes of making the arrest justified his warrantless intrusion.

■■■ Nevertheless, defendants argue that once the arrests were completed, the exigency which had initially justified the warrantless entry onto the property ceased and the police could no longer search the premises for evidence until they obtained a warrant. While it is true that the plain-view doctrine cannot be used "to extend a general exploratory

search from one object to another until something incriminating at last emerges" (*Coolidge*, 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038), nor may the police "justify a planned warrantless seizure by maneuvering themselves within 'plain view' of the object they want" (403 U.S. 443, 469-70 n.26, 29 L. Ed. 2d 564, 585 n.26, 91 S. Ct. 2022, 2040 n.26), it must be emphasized that the evidence here was plainly visible to Officer Owens before he entered the Crowder property. As our supreme court noted in *City of Decatur v. Kushmer* (1969), 43 Ill. 2d 334, 338, 253 N.E.2d 425, 428: " 'A search implies a prying into hidden places for that which is concealed, and it is not a search to observe that which is open to view. A search implies an invasion and quest with some sort of force either actual or constructive.' [Citations.]"

■■ ■ But the defendants contend that if Owens did in fact see the Corvette being driven into the shed before he entered the property, then the warrantless entry and search of the shed to more closely examine the vehicle after the arrests was not "inadvertent." (*Coolidge*, 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038.) We would first note that it is not altogether clear whether the court in *Coolidge* intended that the requirement of inadvertent discovery encompass stolen property and contraband as well as other evidence. The plurality opinion, by negative implication, would seem to have excluded this type of evidence from the effect of the rule:

> "The initial intrusion may, of course, be legitimated not by a warrant but by one of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such intrusion to the seizure of objects—*not contraband nor stolen nor dangerous in themselves*—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure." (Emphasis added.) (*Coolidge*, 403 U.S. 443, 471, 29 L. Ed. 2d 564, 586, 91 S. Ct. 2022, 2040-41.)

In any event, we do not believe that the requirement of inadvertence was meant to apply to situations such as that at bar where the police, unlike those in *Coolidge*, did not know long in advance that the Corvette would be on the Crowder property or that it would be driven into the shed. (See, *e.g., People v. Rinaldo* (1980), 80 Ill. App. 3d 433, 399 N.E.2d 1027.) Rather, as the court observed in *People v. Dennison* (1978), 61 Ill. App. 3d 473, 477, 378 N.E.2d 220, 224:

> "It is true that *Coolidge* employs language which requires that the discovery of evidence be 'inadvertent' but it does not require officers going to a residence for a legitimate investigative purpose to ignore evidence lying about in the open, clearly visible. The

> officers are not required to be as the three monkeys who can 'see no evil.' [Citations.]"

The Corvette here was in plain view prior to the time of Officer Owens' legal entry onto the property in "hot pursuit"; it was observed being driven into the shed; the doors of the shed were left open. Under these facts, the subsequent entry into the shed to examine the Corvette did not convert the initial, limited intrusion into a general exploratory search. Moreover, although it appears that certain other police officers exceeded the bounds of plain view by searching in the loft of the barn for additional evidence before the arrival of the search warrant, none of the evidence so discovered was used at trial, or led to the discovery of the Corvette. Lawfully seized evidence will not be excluded because of a subsequent, unlawful search for other property. *United States v. Holmes* (7th Cir. 1971), 452 F.2d 249; *United States v. Artieri* (2d Cir. 1974), 491 F.2d 440.

## II

As an alternative ground in support of defendants' motion to quash, it is argued that the trial court erred in refusing to order a hearing when it was shown at trial that one of the affidavits in support of the search warrant contained errors.

The alleged mistakes, characterized by defendants as "deliberate falsehood and/or reckless disregard of the truth," were the statements in Officer Williams' affidavit that he had seen the license numbers of the Corvette and van, and had observed both defendants in the Corvette from his surveillance post at the Ramada Inn. At trial, Williams denied these statements. The importance of the errors, according to the defendants, is that this information was relied upon by the only other affiant, Officer Owens, when he received the report of the stolen Corvette on the radio and was, in turn, recited in Owens' affidavit in support of the motion for a search warrant. Without this information defendants contend that the remaining information contained in the affidavits would not have been sufficient to justify the issuance of a warrant under the standards of *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509.

Both sides devoted considerable argument to the question of whether *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, decided prior to trial but after the search warrant was issued in the present case, should be given retroactive effect. *Franks* requires that an evidentiary hearing be held when a defendant attacks the veracity of an affidavit supporting a search warrant, provided that the statement at issue was necessary to a finding of probable cause and that there are specific allegations showing deliberate falsehood or reckless disregard of the truth. Subsequent to argument before this court, however, the Illinois Supreme Court handed down its decision in *People v. Laws* (1981), 84 Ill.

2d 493, 419 N.E.2d 1150, wherein it held that *Franks* will not be given retroactive application in this State. Moreover, even under the *Franks* test, defendants have failed to show that the statements at issue were necessary to the finding of probable cause. As the State points out, even if all references to license numbers and the presence of both defendants in the Corvette were deleted from Williams' affidavit, there are ample facts remaining in both Williams' and Owens' affidavits to convince an impartial magistrate that the identification was sufficiently certain to justify the issuance of a warrant.

## III

The defendants next contend that they were denied a fair trial when the trial judge refused to declare a mistrial or voir dire the jury during the trial, after two articles were published in Rockford newspapers on December 8 and 9, 1978, relating to the trial of the defendants.

These articles, which appeared while the trial was in progress, reported that threats had been made on the lives of two of the police officers who had testified at trial. The first article appeared on Friday, December 8, in the Rockford Register-Republic and prominently featured a subheadline in which appeared the following: "* * * threats have been made on Police Officer Tom Owens' life, and his whereabouts are not being revealed—Robert Gemignani." The text of the article identified Gemignani as chief administrative assistant to Winnebago County State's Attorney Daniel Doyle. The major portion of the news item recounted the testimony given and two motions made at trial that day. The second story was published in the Saturday, December 9, edition of the Rockford Register-Star and was highlighted by the headline, "Police probe threats against officers." The body of the article gave a detailed account of the threats against the two Rockford police officers who served as prosecution witnesses. An unidentified source was said to have revealed that an attempt had been made to contract for the witnesses' murder. Robert Gemignani's statement of the previous day was repeated, although Saturday's account identified him as a "Winnebago County assistant state's attorney." The remaining half of the 500 word piece summarized the evidence at trial and related that final arguments were scheduled to begin Monday.

In addition to lengthy admonishments not to listen to or read accounts of the case on radio, television, or in the newspapers at the end of the proceedings each day, the trial court on the date of Friday's publication noted to the jury that something had been published relative to the case and gave the jury special precautions not to read the article.

On Monday, December 11, defendants' attorneys moved that the

jury be polled to determine whether any juror had read Friday's or Saturday's article and also moved for a mistrial. The trial court denied the motions, ruling that the defendants must show more than the mere publication of newspaper articles.

■■ The question of whether a jury should be interrogated with respect to a given newspaper article rests in the sound discretion of the trial judge. (*People v. Weaver* (1980), 90 Ill. App. 3d 299, 412 N.E.2d 1353.) *People v. Cordova* (1980), 83 Ill. App. 3d 147, 149, 403 N.E.2d 788, 789, articulated the procedure to be followed when a defendant moves to poll the jury:

> "[T]he trial court is required to make a two-part analysis when an allegation of prejudicial publicity is raised. Step one is a consideration of the nature of the publicity, its content and its potential for prejudice. (*People v. Cox* (1966), 74 Ill. App. 2d 342, 220 N.E.2d 7.) If the trial court determines the publicity is not prejudicial, there is no need to poll the jury. (*People v. Hurley* (1973), 10 Ill. App. 3d 74, 293 N.E.2d 341.)"

*People v. Cox* (1966), 74 Ill. App. 2d 342, 220 N.E.2d 7, is a pivotal case in the area of prejudicial publicity. *Cox* reversed and remanded a conviction where an article about the defendant appeared in Decatur's only morning paper, even though there was no evidence that any juror had read the article and the trial judge frequently cautioned the jury regarding media influence. The court held that the failure of the trial judge to poll the jury required reversal, noting: "It strikes us that inquiry of the jury is at least a condition essential to the exercise of a sound discretion and that due process ought not hang in balance on the conjecture that no harm was done." (74 Ill. App. 2d 342, 347, 220 N.E.2d 7, 10.) But the *Cox* court cautioned:

> "This does not imply that every newspaper article published during trial requires an interrogation of the jury. Its nature, content and prejudicial effect, if any, is to be resolved by the trial court in an exercise of sound discretion. The article must be produced and made a part of the record and its prejudicial effect, if any, first carefully explored by the trial court." 74 Ill. App. 2d 342, 347, 220 N.E.2d 7, 10.

The cases in this area stress the character and nature of the prejudicial statements. (See, *e.g., People v. Keegan* (1971), 52 Ill. 2d 147, 286 N.E.2d 345; *People v. Hryciuk* (1954), 5 Ill. 2d 176, 125 N.E.2d 61.) *Hryciuk*, which affirmed the trial court's granting of a new trial, suggested that the tendency of a law-abiding citizen reading the publicity to become incensed and incited with the desire to punish the defendant is a factor. The *Hryciuk* court also noted, but without measuring its significance, that the prosecution in that case had leaked the offending matter to the press,

stating: "He [the prosecutor] knew, or should have known, of its emotional impact upon those who would read the story, including the jurors." 5 Ill. 2d 176, 185, 125 N.E.2d 61, 66.

It has been held that a report of threats directed to a State's witness and of increased security is potentially prejudicial. This is because of the possibility that a person reading the article will conclude that the defendant must be responsible for the threats and must have been motivated by a desire to conceal his guilt of the crime for which he is being tried. *People v. Henderson* (1976), 39 Ill. App. 3d 502, 348 N.E.2d 854 (a voir dire of the jury was conducted and the trial court's decision to deny a motion for mistrial was affirmed).

A survey of the cases affirming the propriety of denials of motions to poll the jury reveals different facts than those now before the court. *People v. Brinn* (1965), 32 Ill. 2d 232, 204 N.E.2d 724, held that the trial court had not abused its discretion in denying a motion to poll the jurors *individually* where it had *collectively* examined and admonished the jury each day and where defendant offered no evidence that any juror had read the offending articles. *People v. Williams* (1978), 62 Ill. App. 3d 966, 379 N.E.2d 1268, also approved a refusal to poll the jurors individually, but only after the trial judge determined that the article contained nothing inflammatory.

The Illinois Supreme Court likewise affirmed a denial of a motion to poll in *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, but the defendant in that case made an apparent attempt to sabotage the prosecution. The court stated: "* * * an effort was made to use the publicity to create an impassé which would result in discharge for lack of timely prosecution." 46 Ill. 2d 348, 369, 263 N.E.2d 840, 853.

Other cases have turned on the fact that the defendant had failed to make the allegedly prejudicial material a part of the record; the appellate tribunal was thus constrained to find that the trial court had ruled correctly. (See *People v. Cordova* (1980), 83 Ill. App. 3d 147, 403 N.E.2d 788; *People v. Heller* (1971), 131 Ill. App. 2d 799, 267 N.E.2d 685; *People v. Williams.*) Another recent case was determined by the fact that defendant failed to make a timely motion to voir dire the jury. *People v. Norwood* (1980), 83 Ill. App. 3d 454, 404 N.E.2d 577.

■■ Applying the *Cordova* test to the case at bar, it must be assumed that the trial judge considered the nature of the publicity, its content and its potential for prejudice and determined that the article was not inflammatory. Since *Cordova* requires that the jury be polled only if the article is prejudicial, the issue presented by defendants is whether the trial court abused its discretion in finding that the article was not inflammatory.

We hold that it was an abuse of discretion. The case is similar to one of the more frequently cited cases in the area of prejudicial publicity.

*People v. Murawski* (1946), 394 Ill. 236, 68 N.E.2d 272, held that the trial court had abused its discretion in denying a motion for mistrial where a newspaper account of boasts by the defendant appeared in Decatur's only morning newspaper. *A fortiori,* where reports of threats against witnesses (which were held potentially prejudicial in *Henderson*) appeared in two of Rockford's daily papers, due process required at least a collective poll of the jury. (See *Brinn.*) The prosecution's open involvement in the dissemination of the damaging material provides an added reason for this result. (See *Hryciuk.*) Therefore, we must reverse the convictions of the defendants and remand for a new trial.

## IV

Defendant Brewer argues that the trial court erred in denying his motion for severance when the State introduced evidence which, he contends, tended to show other crimes by defendant Crowder.

■■ Generally, those indicted jointly for the commission of an offense are to be tried together. The primary question is whether the defenses of the several defendants are so antagonistic that a severance is needed for a fair trial. (*People v. Mertens* (1979), 77 Ill. App. 3d 791, 396 N.E.2d 595.) The granting or denial of a severance is a matter for the sound discretion of the trial judge. (*People v. Appold* (1976), 39 Ill. App. 3d 814, 350 N.E.2d 511.) The question then is whether the trial court abused its discretion in denying the motion because the evidence adduced allegedly denied Brewer a fair trial. We find that it did not.

Defendant relies on *People v. Pelate* (1977), 49 Ill. App. 3d 11, 363 N.E.2d 860, but that case is readily distinguishable. *Pelate* involved the erroneous admission of other crimes evidence and not a motion for severance.

There are two problems with defendant's argument. The first is that, as in *Appold,* the testimony objected to cannot be said to be prejudicial. Brewer argues that Officer Vaughn's statement on redirect examination by the State that he had seen defendant Crowder's picture before March 17, the date of the arrest, constituted a reference to police surveillance of co-defendant Crowder. He asserts that this violated an agreement made by the prosecutor not to introduce such evidence. But Officer Vaughn's answers were vague at best, and it is unlikely that any reference to prior surveillance was communicated. Brewer also claims that the evidence regarding persons named Lasco, Scott, and Passenou, whom Vaughn testified were "known associates" of defendant Crowder, likewise revealed prior surveillance of Crowder. But the testimony cannot be construed to convey that sort of information.

The second problem with defendant's argument is that his own counsel opened the door to such inquiry. Defense counsel asked Vaughn

512

whether he had not identified Crowder from a photograph he had seen prior to the date of the arrest, and he also questioned him regarding surveillance of Lasco, Scott, and Passenou. We think that the questions of the State on redirect were relevant in light of the cross-examination and did not impermissibly enlarge upon the matters brought out in cross-examination. See *People v. Coleman* (1972), 9 Ill. App. 3d 402, 292 N.E.2d 483.

In summary, we hold that although the trial court properly denied defendants' motion to suppress, and defendant Brewer's motion for severance, it committed prejudicial error when it denied defendants' motion to voir dire the jury. We therefore reverse and remand for a new trial.

Reversed and remanded.

SEIDENFELD, P. J., and UNVERZAGT, J., concur.