2022 IL App (2d) 210254-U
No. 2-21-0254
Order filed August 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-993 |
| | ) | |
| CESAR NATALI RODRIGUEZ, | ) | Honorable |
| | ) | Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's trial counsel was not ineffective, and the State provided sufficient evidence that defendant was armed with a dangerous weapon. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Cesar Natali Rodriguez, was convicted of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), aggravated kidnapping (720 ILCS 5/10-2(a)(5) (West 2016)), and armed violence (720 ILCS 5/33A-2(a) (West 2016)). He was sentenced to concurrent terms of 16 years' imprisonment. On appeal, he argues that his trial counsel was ineffective for failing to adequately challenge DNA evidence, and that there was insufficient evidence that he was armed with a "dangerous weapon," specifically a knife longer than three inches. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On August 28, 2019, defendant was charged in a 10-count indictment for crimes that occurred on November 1, 2016, at Spring Hill Mall. Counts I and II alleged armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)) for knowingly taking property from Mark Earsley by the use of force while armed with a dangerous weapon, a knife. In particular, count I alleged that defendant took Earsley's wallet and security belt, and count II alleged that he took cellular telephones from Earsley's "presence." Count III alleged aggravated kidnapping (720 ILCS 5/10-2(a)(5) (West 2016)) for secretly confining Earsley against his will by handcuffing him to a drainage pipe in an area not accessible to the public, while armed with a knife. Count IV alleged armed violence (720 ILCS 5/33A-2(a) (West 2016)) for entering Spring Hill Mall with the intent to commit a theft while armed with a knife. Count V alleged theft (750 ILCS 5/16-1(a)(1) (West 2016)) for knowingly obtaining unauthorized control over property belonging to Cricket Wireless, T-Mobile, A1 Accessories, and Nestle Tollhouse with a value of at least $10,000 but under $100,000. Count VI alleged theft of cell phones from Cricket Wireless having a value of over $500 but less than $10,000, and the same was alleged as to T-Mobile in count VII. Count VIII alleged aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2016)) for knowingly detaining Earsley while using a knife. Count IX alleged theft for knowingly obtaining unauthorized control of currency less than $500 belonging to A1 Accessories, and count X alleged the same as to Nestle Tollhouse.

¶ 5     Testimony in defendant's jury trial began on May 21, 2021. Earsley provided the following testimony. On November 1, 2016, he was working the night shift as a security guard at Spring Hill Mall. At about 12:30 a.m., he was walking through an area of the mall called Corridor B, which led to the back entrances of some stores. One of the stores was an H&M store that was under construction. When Earsley reached an alcove in the corridor, he was attacked by two men

who pushed him to the ground. They turned him to his stomach, and his glasses were knocked off in the process. One man was on top of him, holding him down, and the other person put a knife near Earsley's throat and told him not to resist. Earsley saw the knife for "give or take, one or two seconds." He thought it was serrated but was not 100% sure because of the stress of the situation and the fact that his glasses had been knocked off. He could not say how long the knife blade was.

¶ 6 Earsley could not clearly see the men's faces because it was dark in that area, but he heard them speak with Hispanic accents. The men bound Earsley's hands with zip ties and put glasses covered with duct tape over his eyes. They removed his boots and took his security equipment and personal belongings. One of the men left for a time, and the other one stayed with him. The first man then came back, and both men took him to the H&M store under construction. They cut off the zip ties and handcuffed him to an iron pipe. At this point, it was about 1 a.m. The men left again, and Earsley was able to remove the duct tape-covered glasses. Earsley remained there until he eventually heard one of the maintenance employees pushing his cart to the common area, and called out to him. As a result of the incident, Earsley had some minor bruises and may have had a light scratch. The police returned his personal belongings to him.

¶ 7 Steven Pozehl testified that on November 1, 2016, he was a building engineer for the mall and arrived at the mall at a little before 3 a.m. to do some tile work for a store under construction. He was pushing a utility cart in the common area when he heard someone calling his name. He located Earsley in the H&M store handcuffed to a roof drain, and he called 911.

¶ 8 The State presented evidence that cash and cell phones were stolen from the Cricket Wireless store totaling $1,300. Surveillance footage from the store showed someone entering the inventory room at 1:12 a.m. Surveillance video from a T-Mobile kiosk showed someone at the kiosk at 1:06 a.m. Cell phones worth a total of $9,786.32 were taken from the kiosk.

¶ 9    Crime scene investigator Beth Eichinger testified to the following. In the alcove area in Corridor B, she recovered boots with a wallet, cell phone, and security wand inside, belonging to Earsley. A little bit beyond the alcove she found two black zip ties in the corridor. In another part of the corridor, she found several strips of grey duct tape and another black zip tie. Inside the H&M store, she found hemostat scissors, and as she walked further in, she found a pair of handcuffs. She also found a roll and strips of gray duct tape, black zip ties, and a pair of black sunglasses that had silver duct tape over the lenses and the sides of the sunglasses. Six to ten feet away from the sunglasses was a trash can that contained a black-handled serrated knife. There were no other construction tools in the areas where she recovered the items. Eichinger measured the knife's blade to be eight inches in length.

¶ 10    Over one year later, the police received a tip from a confidential informant that defendant and Stephanie Smith were involved in the crime. The police obtained a search warrant for their phone records and learned that there were four phone calls between the two on November 1, 2016. Detective Michael Slager went to Smith's house in Florida with other officers in May 2019 for an unannounced visit. He read Smith her *Miranda* rights, and Smith first denied knowledge of the incident, but after Slager said that he would stop by her workplace the next day, she agreed to talk to the police. Smith also agreed to give a buccal swab for DNA testing.

¶ 11    At trial, Smith testified to the following. In 2016, she lived about 10 minutes from Spring Hill Mall. That year, she met defendant through her sister, and they had each other's phone numbers. She described her relationship with defendant as "party friends" or "acquaintances" and not romantic. The night of October 31, 2016, Smith was babysitting for a friend who returned at about 11:30 or 11:45 pm. Smith was leaving around midnight on November 1, 2016, when defendant called and asked her to pick him up at his new job doing inventory at Spring Hill Mall.

Smith drove there and parked in the Kohl's parking lot. She waited for about 30 minutes and called defendant three or four times while she was waiting. He said that he was finishing up and would be right out. Smith saw defendant when he was right by the car, wearing dark jeans, a dark green jacket, and a beanie skull cap. Defendant was not carrying anything. He was "very amped up, excited," but that was "pretty much how he always kind of was." Smith brought defendant to a party at the apartment Smith shared with her sister. She did not talk to defendant very much there, but he said that he had "iPhones and that he was trying to get a hold [*sic*] of his buddy." Smith did not know what defendant was talking about. A day or two later, Smith read an article about the break in at the mall at a time that seemed to correspond to when she picked up defendant. Smith called defendant to ask if he was involved, and defendant said, "Oh shit, it was me and my buddy."

¶ 12    Smith did not see or talk to defendant again. She did not go to the police because she did not think that she had enough evidence, as defendant had not been carrying anything. Smith was also afraid of "backlash" and feared putting herself in danger. Smith admitted that she initially told the police that she was working at a restaurant called "Rookies" when defendant called but later remembered that she was unemployed at the time. Smith had been training to work at Rookies in November 2019 and later began working there. Smith also told the officers that she may have had a few drinks that night and was a little bit "buzzed," but she testified at trial that she had not been drinking that night.

¶ 13    Dexter McElhiney, a forensic scientist, was accepted as an expert in forensic biology and DNA analysis. We summarize his testimony. When analyzing DNA, he would look at 23 locations and a sex-determining location. He could not always obtain 23 locations from a DNA sample because it could be degraded, old, or have a very low amount of DNA. He could still perform a DNA analysis and comparison if he had less than 23 locations. From the sunglasses recovered at

the crime scene, McElhiney obtained a major male profile and a minor male profile, with the minor profile identified at nine locations. Earsley was excluded as a contributor from both of the profiles based on his buccal swab. McElhiney ran both major and minor DNA profiles through the State database, which revealed an association of the major profile with defendant. McElhiney received a buccal swab from defendant after his arrest, and it revealed that defendant could "be included as a contributor" to the major male profile on the sunglasses. Defendant could similarly be included as a contributor to two of the recovered zip ties, which had major male profiles identified at eight locations. Using "random-match probability," which was a procedure generally accepted in the scientific community, the profile on one of the zip ties could be expected in 1 out of 49,000 individuals for People's exhibit 97 (partial zip tie from the area where Earsley was located) and one out of 1.7 million individuals for People's exhibit 93 (zip tie from Corridor B). The profile from the sunglasses could be expected in 1 in 41 septillion individuals, which number had 24 zeros in it.

¶ 14     On cross-examination, McElhiney testified that he could not tell the exact time or date when DNA information was left on a particular item. DNA could also be left by "secondary transfer," where a person touched another person who touched an item, or by "contamination," where the item came into contact with something that had DNA on it. The lab received the sunglasses in November 2016 but McElhiney did not test them until March 2017. The lab did not receive the zip ties in question until April 2019, and he testified that he tested them the same month. Earsley could be excluded as a contributor to the DNA found on the sunglasses. McElhiney did not use the term "match" for DNA profiles because his agency had changed its terminology and had moved to using statistics instead.

¶ 15    Sergeant Steve Bruening was accepted as an expert in historical cell phone site analysis and testified to the following. He had received specialized training in cell phone call-detail record analysis. According to analysis of records of the phone associated with defendant, on October 31, 2016, it was used in northern Kane County beginning at 10:26 p.m. At 11:26 p.m. the phone began using the cell phone tower at the northwest corner of Spring Hill Mall, which was the closes AT&T tower to the mall, and it connected there again at 11:42 p.m. It next connected with that cell tower at 12:26 a.m. on November 1, 2016, and again at 12:42 a.m., 1:06 a.m., 1:19 a.m., and 1:26 a.m. At 1:36 a.m., the phone connected to a different cell phone tower, located next to Huntley Road. When a phone connected with different cell phone tower locations, it was generally indicative of movement. Cell phones connected to the towers with the strongest signal, which was generally the cell tower closes to the phone's location. It was used to determine the approximate location of the phone rather than pinpointing the location of the caller. Further, what tower the phone connected to was affected by factors such as the power of the cell tower, the power of the phone, weather, and obstacles such as building and trees. Also, if the closest tower was busy, the phone would use the next strongest tower.

¶ 16    There were four phone calls made between defendant's and Smith's phone numbers. The first was from defendant to Smith at 12:38 a.m. on November 1, 2016, and lasted 44 seconds. The second was at 12:40 a.m. from Smith to defendant and lasted 27 seconds. The third call was from defendant to Smith at 12:43 a.m. and lasted eight seconds. The last call was from Smith to defendant at 12:56 a.m., and it lasted for 1 minute and 25 seconds.

¶ 17    Evidence was presented that defendant's house was 1.9 miles from Spring Hill Mall, aerially. Bruening testified that there were cell phone towers closer to defendant's house that the one near Spring Hill Mall.

¶ 18    During the trial, the State nolle prossed counts IX and X.

¶ 19    In closing argument, on the subject of the DNA evidence, defense counsel argued that there were almost 100 exhibits and numerous physical items, many of which were taken from Earsley and touched by the perpetrators, but there was no evidence of DNA found on them. Defense counsel argued that the State could claim that the perpetrators were wearing gloves, but that would not sufficiently explain the DNA found on the sunglasses. He continued:

> So this sunglasses was [*sic*] on Mark Earsley, no dispute. And he took it off, throw [*sic*] it on the ground where he was found. And the DNA experts collected DNA from the sunglasses. Two mixture[s], but not Mark Earsley's DNA was found. So science says that DNA is here, then it must be the person touch[ed] this, but we know these sunglasses was on Mark Earsley and why is he excluded. Where is his DNA? So is [it that] the DNA expert didn't do a good job or sometimes DNA doesn't get transferred and does something else.
>
> And those two zip ties they said they found [defendant's DNA]. That was tested [in] 2019 and that was before that in 2018 the DNA there was some data search which surfaced my client's name. And those two zip tie[s] was [*sic*] tested and they are saying that my client cannot be excluded. And you heard about contamination and transfer DNA, so consider those [*sic*] information. This is all after my client was being the focus of the investigation and also whose all three items were not found on his person.
>
> This is not [a] pristine environment. It was all found on the ground. No latent fingerprints. You heard the expert. So I expect [that the] State is going to say they were wearing gloves. That's why, even though there is [*sic*] numerous physical items, there is no latent prints. Either they are all wearing gloves and no latent prints and there should be no DNA."

¶ 20    The jury subsequently found defendant guilty of all remaining counts. The trial court sentenced defendant to 16 years' imprisonment on counts I, II, III, and IV, to run concurrently, and found that the remaining counts merged.

¶ 21    This timely appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23                        A. Ineffective Assistance of Counsel

¶ 24    Defendant first argues that his trial counsel was ineffective because he failed to challenge McElhiney's conclusions that defendant was a contributor to the major male DNA profile found on the sunglasses, and a contributor to the two major male profiles found on the zip-ties based on an eight-loci match.

¶ 25     For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860, ¶ 14. In most situations, this is done by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id.* A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 26    Defendant argues that McElhiney did not provide the basis for his conclusion regarding the profile from the sunglasses, and testified that he analyzed only eight loci with respect to the

profiles from the zip-ties. Defendant cites *People v. Safford*, 392 Ill. App. 3d 212, 221, 228 (2009), for the proposition that the proponent of an expert's testimony must lay an adequate foundation showing that the information upon which the expert is basing his opinion is reliable, and that an opinion without any explanation or factual basis is inadmissible. Defendant argues that McElhiney's conclusion regarding the DNA profile from the sunglasses lacked a factual basis because he did not explain his conclusion regarding the profile. Defendant argues that McElhiney's conclusions about the profiles from the zip-ties were based on only eight out of 23 loci, and were therefore incomplete matches. Defendant contends that trial counsel's failure to challenge these significant flaws was objectively unreasonable.

¶ 27    Defendant additionally argues that even if McElhiney had analyzed a high number of loci on the profile from the sunglasses, it does not mean that his conclusions were infallible. Citing *People v. Watson*, 2012 IL App (2d) 091328, defendant argues that Illinois courts have found that anything less than a complete loci match is susceptible to a defense argument that the results are too uncertain to establish a DNA link. In *Watson*, the expert testified that he could obtain information from only 7 of 13 loci, and that he was not able to exclude the defendant as a contributor. *Id.* ¶ 9. On appeal, the defendant argued that his counsel was ineffective for failing to present any evidence reflecting that a finding based on a profile of less than 13 loci was unreliable. *Id.* ¶ 20. We agreed, stating that counsel did not argue or present any evidence challenging the reliability of a partial-profile comparison. *Id.* ¶ 25. Defendant also cites *People v. Wright*, 2012 IL App (1st) 073106, ¶ 82, where the court stated that a study of an Illinois database yielded 903 pairs at 9 loci, but looking at additional loci showed that they were not matches.

¶ 28    Defendant argues that counsel failed to question McElhiney about the number of loci he analyzed for the profile from the sunglasses and the significance of an incomplete eight-loci match

from the two profiles from the zip-ties, and in fact failed to ask any questions challenging his conclusions. Defendant maintains that because McElhiney generally analyzed DNA profiles at up to 23 locations, counsel had a strong basis to argue that his conclusions were unreliable or that partial profile matches might not be uncommon. Defendant argues that given the statistical testimony about the almost nonexistent possibility that the DNA belonged to someone else, especially for the sunglasses, counsel's failure to challenge the DNA results was certainly unreasonable.

¶ 29     Defendant argues that he was prejudiced by the deficient performance because the DNA evidence conveyed to the jury that it was statistically impossible that someone else committed the crimes. Defendant argues that because counsel did not challenge the evidence, defendant could not prevail at trial as there was no reason for the jury to doubt the evidence that had been portrayed by the State as incontrovertible science.

¶ 30     Defendant further argues that the State's other evidence was far from overwhelming, as there was no eyewitness testimony or surveillance video that identified him as one of the offenders. Defendant argues that although Smith testified that she picked him up at the mall at the time of the offense, her credibility was questionable for several reasons. Defendant asserts that Smith kept her knowledge about the offense secret for several years, initially claiming that she did not know anything when the police came to her home. Defendant argues that it was not until Detective Slager threatened to come to her work location that she agreed to speak and implicated him. Defendant contends that Smith therefore had a motive to deflect police suspicion away from herself or curry favor with the police. Defendant argues that Smith's testimony was also inconsistent with her prior statements to police, showing that it was not reliable. Defendant points out that Smith testified at trial that she was babysitting before picking him up but initially told the police that she was

working at a restaurant. He also highlights that she testified that she was sober but previously told Detective Slager that she had a couple of drinks before picking defendant up.

¶ 31    Defendant maintains that the State's only other evidence linking him to the offense was the historical cell site analysis showing that his phone was using the cell tower near Spring Hill Mall at the time of the incident. Defendant argues that, however, it would not be unusual for his phone to be using the tower because he lived only 1.9 miles away. Defendant also highlights testimony that the cell site analysis showed only the approximate location of the phone and that a cell phone could use a cell tower other than the nearest one for a variety of reasons. Defendant argues that the analysis therefore indicated nothing more than that he was in the area, perhaps at his home, at the time of the incident.

¶ 32    We conclude that defense counsel did not provide ineffective assistance. First, his representation did not fall below an objective standard of reasonableness on the issue of the DNA testing. Though defendant refers to "incomplete matches" in the DNA, McElhiney testified that his agency did not use the term "match" anymore but instead used statistics to describe the probability that someone was a contributor. In *People v. Richmond*, 2017 IL App (1st) 150642, ¶ 13, the court described the "product rule," which is used "to compute the likelihood that any person other than the defendant would have the same alleles as those found at the crime scene." The court stated that the product rule has been accepted as a statistical method for estimating the frequency of a DNA match. *Id.* ¶ 19. The court further criticized *Wright*, stating that the matches within the Illinois database fell within the statistical probabilities described and supported the use of the product rule. It stated that competent counsel could decide that evidence of the nine loci matches in Illinois's DNA database would not help his client, and that "introducing evidence of those matches might require the introduction of complex statistical calculations that could confuse

jurors." *Id.* 24; see *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 122 (stating same conclusion); see also *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 133 (argument about search of Illinois database that revealed nearly 2,000 profiles that matched at 9 loci has been discredited).

¶ 33    Accordingly, delving too deeply into the statistical significance of the number of loci analyzed could have confused the jurors and may have even bolstered the State's case. Defense counsel instead sought to undermine the DNA evidence in other ways, eliciting testimony that DNA could be left by secondary transfer or contamination; that the lab tested the sunglasses months after receiving them; that the zip ties were not received and tested until April 2019; and that Earsley's DNA was not found on the sunglasses. Defense counsel tied this information into his closing argument, questioning why DNA was not found on numerous other items handled by the perpetrators. He argued that if it was because the perpetrators were wearing gloves, their DNA should not have been on other items. Defense counsel argued that if they were not wearing gloves, fingerprint evidence should have been found. He highlighted that although it was undisputed that Earsley was wearing the sunglasses and touched them when he took them off, Earsley's DNA was not found on them, which could lead the jury to question the reliability of all DNA evidence. Defense counsel noted that defendant was named as a contributor only after he became "the focus of the investigation," and he tied that to potential secondary transfer and contamination. Therefore, unlike *Watson*, defense counsel challenged the DNA evidence. *Cf. Watson*, 2012 IL App (2d) 091328, ¶ 32 ("it is clear that counsel's challenge to [the DNA] evidence was virtually nonexistent"). It is true that defense counsel could have questioned McElhiney about the number of loci not matched, possibly casting additional doubt on the DNA evidence, but we cannot say that his failure to do so equated to incompetent representation given that it would not have changed

the statistics McElhiney provided and given defense counsel's other attacks on the DNA evidence. See *Jackson*, 2018 IL App (5th) 150274, ¶ 122 (providing similar analysis).

¶ 34 Even if, *arguendo*, defense counsel's performance was deficient in failing to question McElhiney further about the number of loci, defendant has not demonstrated prejudice. That is, creating additional doubt of the strength of the DNA evidence would not result in a reasonable probability that the proceeding would have resulted differently, as defendant's participation in the crime was corroborated by other evidence, most significantly Smith's testimony and phone records. Smith testified that at about midnight on November 1, 2016, defendant called her and asked her to pick him up from his new job doing inventory at Spring Hill Mall. Phone records showed a call from defendant to Smith at 12:38 a.m. Smith testified that she drove to the mall. She waited for about 30 minutes and called defendant three or four times while she was waiting. Call records show that she called him at 12:40 a.m. and 12:56 a.m., and that he called her at 12:43 a.m. According to Smith, defendant said that he was finishing up and would be right out. Cell phone site analysis showed that defendant's phone began using the cell phone tower at the northwest corner of Spring Hill Mall at 11:26 p.m. on October 31, 2016, connected there again at 11:42 p.m., and continued to connect there on November 1, 2016, at 12:26 a.m., 12:42 a.m., 1:06 a.m., 1:19 a.m., and 1:26 a.m. These connections lend support to defendant's presence at the mall at the time of the crimes and to Smith's testimony.

¶ 35 Smith testified that defendant eventually came out, and they drove to a party at Smith's apartment. Smith testified that defendant said that he had "iPhones and that he was trying to get a hold [*sic*] of his buddy." Smith additionally testified that she read an article a day or two afterwards about the break in at the mall, and she called defendant to ask about it. Defendant said, "Oh shit, it was me and my buddy." In this manner, defendant confessed his participation in the incident to

Smith. Though defendant argues that Smith's testimony was inconsistent with what she told the police, the inconsistencies are minor and not regarding the information that tied the crimes to defendant. Smith also explained her initial statement that she was working at Rookies on the night in question by testifying that she was training there at the time and subsequently started working there.

¶ 36   Consider all of the additional evidence beyond the DNA evidence, there is not a reasonable probability that the proceeding would have resulted differently had defense counsel asked more questions about the foundation for the DNA evidence. In this manner, this case is readily distinguishable from *Watson*, 2012 IL App (2d) 091328, ¶ 32, as the only evidence linking the defendant to the crime there was DNA evidence.

¶ 37                              B. Sufficiency of the Evidence

¶ 38   Defendant next argues that the State failed to prove beyond a reasonable doubt that a "dangerous weapon," specifically a knife longer than three inches, was used during the offenses, such that his conviction of aggravated kidnapping should be reduced to kidnapping and his conviction of armed violence should be vacated. Defendant maintains that Earsley's testimony was the only eyewitness account and was insufficient to establish the required element, as Earsley testified that he could not determine the length of the knife used by the offenders. Defendant argues that the State's only other evidence was the discovery of an eight-inch serrated knife in a garbage can at the H&M store where Earsley was found. Defendant asserts that there was little evidence that the recovered knife was the same one observed by Earsley, as Earsley saw it only in the corridor where he was attacked, and for only one or two seconds. Defendant argued that Earsley provided only tentative testimony that the knife was serrated, testifying, "It looked to be serrated,

but I can't say 100% certain because, again, the stress of the situation and my glasses were knocked off."

¶ 39 Defendant argues that, consequently, the State's only real evidence that the recovered knife was the same knife observed by Earsley was the fact that it was near the crime scene. Defendant maintains that this evidence was insufficient to constitute proof beyond a reasonable doubt. Citing *People v. Weaver*, 90 Ill. App. 3d 299 (1980), defendant argues that where a State's case is circumstantial, proof beyond a reasonable doubt requires the exclusion of every reasonable hypothesis of innocence consistent with the defendant's innocence. Defendant argues that although it is possible that the knife was left at the scene by someone else, especially considering that the H&M store was under construction and would have had workers with tools coming in and out. Defendant argues that it also makes little sense that the offenders would discard a weapon so close to the crime scene.

¶ 40 When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 41 As charged, both aggravated kidnapping and armed violence require that the offender acted while armed with a dangerous weapon. See 720 ILCS 5/10-2(a)(5) (West 2016)); 720 ILCS

5/33A-2(a) (West 2016). A knife must have a blade of at least three inches to qualify as a dangerous weapon for these crimes. 720 ILCS 5/33A-1(c)(1), (2) (West 2016).

¶ 42    It is undisputed that the knife was found in the garbage can near where Earsley was handcuffed to the pipe in the H&M store, and that the knife was serrated and had an eight-inch blade. The only dispute is whether there was sufficient evidence that it was the knife that Earsley saw. Although Earsley was not 100% sure that the knife he saw was serrated, he did briefly see the knife for one or two seconds and thought that it was serrated. Correspondingly, the knife at issue was found in close proximity to where defendant was handcuffed and where the offenders had been. It was in a trash can with what appeared to be pieces of drywall, with no other tools or weapons anywhere nearby. In closing argument, defense counsel cast doubt on whether the knife was the same, arguing that the police never asked Earsley to identify the recovered knife, no DNA was found on the knife, and the knife was found in a trash can with miscellaneous items including construction materials. It was up to the jury to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts, with this standard applying whether the evidence was direct or circumstantial. *People v. Alojani*, 2022 IL 127037, ¶ 66. Defendant's citation to *Weaver* is unpersuasive, as our supreme court has declared that " '[T]he reasonable hypothesis of innocence standard of review is no longer viable in Illinois.' " *People v. Walker*, 2020 IL App (4th) 180774, ¶ 79 (quoting *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Instead, we use the aforementioned reasonable doubt test. *Id.*; see *supra* ¶ 40. Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found the essential elements of the crimes beyond a reasonable doubt, specifically that the knife used was the one found in the trash can, with a blade longer than three inches.

¶ 43                                   III. CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 45    Affirmed.