2025 IL App (2d) 230187-U
No. 2-23-0187
Order filed January 28, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-993 |
| CESAR NATALI RODRIGUEZ, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court correctly dismissed defendant's ineffective assistance of appellate counsel claims at the first stage of postconviction proceedings. We affirm.

¶ 2    Defendant Cesar Natali Rodriguez appeals from a judgment summarily dismissing his petition for postconviction relief at the first stage. He contends his petition stated an arguable claim that appellate counsel was ineffective for failing to challenge the lack of foundation for historical cell phone site data that was admitted at trial. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    A jury found defendant guilty of armed robbery, armed violence, aggravated kidnapping,

aggravated unlawful restraint, and theft of property worth between $10,000 and $100,000 at the Spring Hill Mall in West Dundee beginning the night of October 31, 2016, and continuing through the morning of November 1, 2016. He was sentenced to concurrent terms of 16 years' imprisonment. On August 26, 2022, this court affirmed the judgment of the trial court, rejecting sufficiency of evidence and ineffective assistance of trial counsel arguments. See *People v. Rodriguez*, 2022 IL App (2d) 210254-U. Accordingly, we discuss only the facts necessary for the disposition of issues in this appeal. A more thorough recitation of the facts is included in defendant's direct appeal. See *id*.

¶ 5    On May 23, 2019, defendant was arrested and charged with multiple offenses for his alleged involvement in a break-in, robbery, and kidnapping of a security guard at the Spring Hill Mall overnight beginning on October 31, 2016, and continuing on November 1, 2016. At trial, Mark Earsley, a security guard, testified that he was working the night shift during the early morning hours of November 1, 2016. At approximately 12:30 a.m., Earsley was walking through a corridor near an alcove when he was attacked by two men, who pushed him to the ground and knocked off his glasses. The two men held him on the floor, put a knife to his throat, and told him not to resist. According to Earsley, the men spoke English with "Hispanic" accents. The men then bound Earsley's hands with zip ties, placed safety glasses covered with duct tape over his eyes, and removed Earsley's equipment belt and personal belongings from his pockets. The men left Earsley, returned, and took him inside a store, cut off the zip ties, and handcuffed him to a drainpipe. Earsley eventually managed to remove the glasses from his eyes but remained handcuffed to the drainpipe until the building engineer arrived at the mall and released him.

¶ 6    Surveillance footage showed a subject inside a cell phone store kiosk at 1:06 a.m. and the inventory room of another cell phone store at 1:12 a.m. A variety of cell phones and cash were

taken.

¶ 7    After police investigated the crime scene, they recovered a pair of hemostat scissors, handcuffs, duct tape, zip ties, sunglasses covered with duct tape, and an eight-inch serrated knife. No arrests were made for several years. In 2018, the police received a tip from a confidential informant that defendant and Stephanie Smith were involved with the crime. The items recovered from the crime scene were tested for DNA, which profiles linked defendant to the crime scene.

¶ 8    The police also obtained search warrants for defendant's and Smith's phones, which revealed that defendant and Smith exchanged four phone calls during the early morning hours of November 1, 2016. The investigating detective then gave the cell phone records to Sergeant Steven Bruening of the Kane County Sheriff's Office, who conducted a historical cell phone site analysis of defendant's cell phone at the time of the offense.

¶ 9    The parties had entered into a stipulation that a cell phone number ending in 4283 was subscribed to defendant's mother and that "at all times relevant to the facts of this incident, [defendant] possessed and used the cell phone with the number" ending in 4283. The stipulation was entered into evidence as State's exhibit 106. Further, the State admitted into evidence without objection exhibit 107, a certificate of authenticity from the cell phone provider for the cell phone number ending in 4283, in compliance with Illinois Rules of Evidence 902(11) and 902(13) (eff. Sept. 28, 2018). The certificate stated that "[a]ll records *** were made at or near the time of occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity" [of the cell phone provider]. The cell phone provider certified the accuracy of the records and that "at all times pertinent to the records certified here the process and system functioned properly and normally." In addition, State's exhibit 108 listed the wireless subscriber information for

defendant's mother and the cell phone number ending in 4283, which was admitted into evidence without objection. Finally, the State admitted into evidence without objection exhibit 109, a CD containing all the cell phone provider's phone records for the number ending in 4283 from October 1, 2016, through November 30, 2016.

¶ 10 At trial, Sergeant Bruening testified that he is an evidence division supervisor at the Kane County Sheriff's Office and regularly investigates digital forensics, including mobile phones, computers, and call-detail mapping. Sergeant Bruening described in detail the specialized training he received to analyze cellular phone records and historical cell-site evidence. He also recounted two certifications he received for "call-detail record mapping," in addition to "a variety of other classes" associated with this training. Sergeant Bruening passed all examinations associated with these certifications and classes. In August 2020, Sergeant Bruening received training from Geocell, a company that provides tools for law enforcement to map out call-detail records. Finally, he received training from Hawk Analytics, which provides the software he uses in his cell site analysis. He stated that the Hawk Analytics software "allows us to take the carrier records, the call-detail records from the cell phone company, and plot it out on a map." The software requires monthly training and online classes for continued learning and updates.

¶ 11 Sergeant Bruening testified that he had analyzed cell phone records and plotted historical cell-site data more than 100 times since 2018. He assisted many government agencies with historical cell-site analysis, including the Department of Homeland Security and the Drug Enforcement Agency, among others. He regularly testifies as an expert on the issue of cell phone forensics. The trial court found Sergeant Bruening to be qualified as an expert in the area of historical cell-site analysis without any objection or questioning by the defense.

¶ 12 Next, Sergeant Bruening explained to the jury how cell phones interact with cell phone

towers and how the cell phone company maintains data sessions that show the phone's communications with the towers. He described historical cell-site analysis as "a review provided by a specific cell phone carrier of the call and data sessions that were made on a particular phone."

¶ 13    In this case, Sergeant Bruening received cell phone records from the West Dundee Police Department to conduct a historical cell-site analysis. The cell phone records, marked as State's exhibits 113A and 113B, had previously been admitted into evidence without objection and Sergeant Bruening described his review of the records and what information they contain:

"In the AT&T records, you get a variety of things. AT&T puts all their records into one, so you actually get the call records, you would get the text messaging records if they were there, and also the data sessions, all in one single report; and inside of that report it gives you the dates, the times that the calls were made, who the calls were made to, the duration of the calls.

It gives you some feature codes describing what occurred in the call *** and then it gives you the tower information, which in this case it will give you a specific region and a tower, and then it will also give you the GPS, the [latitude/longitude] where the tower is.

Then after that it gives you the facing side of the tower. We talked about there's three sides to a tower. It will generally give you which face of the tower that the cell phone communicated with."

¶ 14    Sergeant Bruening stated that the cell phone records aided in his historical cell-site analysis, referring to the "UTC time" in State's exhibits 113A and 113B. He explained that "UTC" refers to "uniform time coordination," and that the UTC is "five or six hours *** ahead of us, depending on if it's daylight savings time or not." The historical cell-site analysis details "[t]he

phone numbers involved, the originating and terminating, and then the cell location of the very last tower," which includes "the cell tower's unique ID, and the latitude and longitude of the actual tower itself, and then the face; which direction of the three sectors of the [tower] face."

¶ 15    Sergeant Bruening then testified that he used the "Cell Hawk" software program to conduct the historical cell-site analysis in this case. According to Sergeant Bruening:

"Cell Hawk is a company that was *** founded about 8 years ago. It only does work for law enforcement, and it's an on-line software program. So it's a paid subscription, and you're able to access it through a secured portal on the internet, and it allows me to take these call-detail records and have them plotted out onto a map."

¶ 16    Sergeant Bruening stated that a "PDF file is loaded directly into the software," and then:

"In the case of the AT&T returns [in this case], since it's all in one and all of the tower locations are contained in one form, you take the PDF report and upload it into their software. It analyzes the returns that are on there. You're allowed to – the only change you can make is you're allowed to put it into your time zone. So we talked about that UTC, so it gets converted into central time zone. We recognize times.

Once it adjusts the report from the [cell phone] carrier, you can then select specific dates and times that you want to see, and you can either take still shots of that or it can play like a movie."

¶ 17    Sergeant Bruening testified that the data cannot be manipulated in any particular way. According to Sergeant Bruening, "[o]nce it's ingested into the software, there's no way to change any data." He has used the Cell Hawk software more than 100 times personally, nearly 1,000 law

enforcement agencies use the same software, and it is "generally accepted in the law enforcement community in conducting historical cell-site analysis."

¶ 18    Here, the Cell Hawk data generated a continuous video showing multiple cell phone locations. Cell Hawk had rendered a slide presentation with the historical cell-site data, which was admitted into evidence without objection as State's exhibit 111 and played for the jury. Sergeant Bruening narrated the presentation as it played before the jury and stated that it was a true and accurate depiction of the presentation generated by the Cell Hawk analysis that he conducted.

¶ 19    Sergeant Bruening testified that defendant's cell phone began using the cell tower closest to the Spring Hill Mall at 11:26 p.m. on October 31, 2016. He stated that use of a particular cell phone tower is indicative of the location of the cell phone in proximity to that cell phone tower. The report showed that another call or data usage was made from the same cell phone tower location at 11:42 p.m. The report detailed additional calls or data usage from the same location after midnight on November 1, 2016, at 12:26 a.m., 12:42 a.m., 1:06 a.m., 1:19 a.m., and 1:26 a.m. At 1:36 a.m., the report showed cell phone usage from a different cell phone tower, which indicated movement of the phone.

¶ 20    Sergeant Bruening also performed a historical cell-site analysis using Cell Hawk software for Smith's cell phone. The report generated by the Cell Hawk software showed that at 1 a.m. on November 1, 2016, eight separate transactions occurred between defendant's and Smith's cell phones. Sergeant Bruening stated that the eight transactions reflected four phone calls that were made using the cell phone tower just outside of Spring Hill Mall. Based on the historical cell-site data, Sergeant Bruening testified that in his opinion, defendant's cell phone was located "in the area where the tower is at the Spring Hill Mall."

¶ 21    On cross-examination, Sergeant Bruening stated that the Cell Hawk software converts the

time records to reflect central time. When defense counsel asked whether Cell Hawk software calculates daylight savings information, Sergeant Bruening explained that the change from daylight savings time occurred on November 6 that year, "but the computer software is smart enough to know the time, so it calculates it for me. I go back and check it, but normally the computer does it."

¶ 22     He testified that several factors contribute to whether a cell phone uses a particular tower, including the power of the cell phone, weather, obstacles, and other frequencies. In addition, if the closest cell phone tower is too busy, the phone will use the cell tower with the next strongest signal. Sergeant Bruening clarified that "[a]ll the Cell Hawk [software] is doing is just interpreting the AT&T records and applying them on a map." According to Sergeant Bruening, the historical cell-site information is not designed to locate a person and only indicates which tower and which phone service is provided to a cell phone at a particular time. Sergeant Bruening also stated that there is no method of definitively pinpointing a cell phone at a particular location, but "[t]he more tower hits you get, the more indicative that the phone is closer to that tower." He stated that "[t]he phone can provide exact GPS locations in some cases, but that's not the data we looked at. All we looked at was just simply a tower location and an approximate area around the tower." He agreed that the records he analyzed "cannot pinpoint the location of the caller."

¶ 23     Smith testified that in 2016, she was living with her sister in Carpentersville. She met defendant "through my sister who was friends with his girlfriend at the moment." She described her relationship with defendant as "party friends, acquaintances, we go out and meet up, just more going out level."

¶ 24     On October 31, 2016, she was babysitting her friend's daughter at that friend's house and left after midnight. Smith received a phone call from defendant, who asked to be picked up from

Spring Hill Mall because he started a "new job doing inventory." She drove to the mall and parked in the parking lot. She received a call from defendant telling her that he had finished working and requesting to be picked up. She had been waiting for defendant for about 30 minutes in the parking lot and called him again to ask how long it would take for him to finish working. She did not have any personal knowledge regarding whether defendant actually was inside the mall. Eventually, defendant entered Smith's car. She did not see whether defendant had exited the mall. She stated that defendant acted "very amped up, excited. *** But that's pretty much how he always kind of was." Smith drove with defendant to her sister's house, where he told Smith "about how he has iPhones" and "that he was trying to get a hold of his buddy." Smith stated that defendant lived with his parents, who were approximately a five to seven minute drive from the mall.

¶ 25    On November 3, 2016, Smith read a newspaper article describing a break-in at the Spring Hill Mall that involved the theft of cell phones. She stated, "[m]y heart dropped because that seemed about the same time that I had picked [defendant] up." Smith called defendant and asked him about the newspaper article, telling him, "please tell me that was not you." Defendant responded, "Oh shit, it was me and my buddy." Smith did not report defendant to the police because she did not see him carrying anything and she was afraid. She stated that had she known defendant had done something illegal, she would not have picked him up from the mall.

¶ 26    On cross-examination, Smith testified that she called defendant three or four times while waiting to pick him up at the mall. She clarified that she did not contact the police because she did not want to put herself in danger and that she was afraid that she would be implicated.

¶ 27    The jury found defendant guilty of two counts of armed robbery with a dangerous weapon, aggravated kidnapping, aggravated unlawful restraint, armed violence, and theft of items valued at more than $10,000. The trial court merged the aggravated unlawful restraint and theft charges,

and sentenced defendant to 16 years in prison on each of the remaining counts, to be served concurrently.

¶ 28      On direct appeal, defendant challenged the sufficiency of the evidence and argued that trial counsel was ineffective for failing to challenge the State's expert's conclusions that defendant fit the DNA profile found on the items recovered at the crime scene. See *Rodriguez*, 2022 IL App (2d) 210254-U. This court held that, viewing the evidence in the light most favorable to the State, "a rational jury could have found the essential elements of the crimes beyond a reasonable doubt, specifically that the knife used was the one found in the trash can, with a blade longer than three inches." *Id*. ¶ 42. In addition, this court rejected defendant's ineffective assistance of trial counsel argument, finding that trial counsel's failure to question the State's expert about the number of unmatched DNA loci did not equate to incompetent representation given that it would not have changed the statistics the expert provided. *Id*. ¶ 33. Furthermore, defendant's participation in the crime was corroborated by other evidence, "most significantly Smith's testimony and phone records." *Id*. ¶ 34. The judgment was affirmed. *Id*. ¶ 44.

¶ 29      On February 21, 2023, defendant filed a *pro se* petition for postconviction relief, arguing ineffective assistance of appellate counsel on direct appeal for not raising trial counsel's failure to: (1) move to quash and suppress cell phone site tracking location evidence that allegedly exceeded the scope of the search warrant; (2) argue insufficient foundation for the Cell Hawk program, which Sergeant Bruening utilized for historical cell-site analysis, particularly the "standards *** used to check the machinery/instruments to make sure the equipment was accurately working *** or how it was calibrated"; and (3) contest the sufficiency of the foundation provided by the State's DNA expert witness.

¶ 30      On May 18, 2023, the trial court dismissed defendant's postconviction petition at the first

stage, finding it had failed to state the gist of a constitutional claim and that the claims were patently frivolous and without merit. Regarding defendant's argument that appellate counsel failed to raise a claim of trial counsel's ineffectiveness for not moving to quash arrest and suppress evidence, the court found that defendant had failed to attach as an exhibit a copy of the search warrant and that Sergeant Bruening was not required to obtain a second search warrant to perform a historical cell-site analysis. The court found that the phone records in question were properly obtained through a search warrant. Next, the court found that the State laid a proper foundation for both the DNA and historical cell-site evidence and that defendant never objected to the lack of foundation for the introduction of this evidence. As to the Cell Hawk software, the court stated that "the expert's testimony about the methodology and his reading of the call detail records for defendant's phone established a sufficient foundation for this testimony." According to the court, Sergeant Bruening "thoroughly explained the basis for his opinions and established a sufficient foundation for them." Moreover, the court held that appellate counsel was not deficient because trial counsel waived the issues by not objecting to lack of foundation during trial. This appeal followed.

¶ 31                                             II. ANALYSIS

¶ 32    On appeal, defendant contends that the trial court erred when it dismissed his postconviction petition at the first stage. Defendant asserts his petition stated an arguable claim that appellate counsel was ineffective for failing to challenge the lack of foundation for the historical cell-site data that was admitted at trial. In addition to this claim, defendant asserts a number of new arguments for the first time on appeal that were not included in his postconviction petition, including: (1) challenging the timeline of events; (2) arguing ineffective assistance of trial counsel for failing to challenge the reliability of DNA evidence; and (3) claiming the State did not

lay a proper foundation for computer-generated business records.

¶ 33     Under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2022)), "[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived." 725 ILCS 5/122-3 (West 2022); see also *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006) (reiterating our supreme court's earlier holdings that a claim not raised in a postconviction petition cannot be raised for the first time on appeal). This court lacks the authority to excuse the forfeiture caused by defendant's failure to include issues in his postconviction petition. *People v. Reed*, 2014 IL App (1st) 122610, ¶ 43 (citing *People v. Jones*, 213 Ill. 2d 498, 507-08 (2004)). Our supreme court has criticized this court for improperly overlooking the waiver provision of the Act and addressing " 'claims raised for the first time on appeal for various and sundry reasons.' " *Pendleton*, 223 Ill. 2d at 475 (quoting *Jones*, 213 Ill. 2d at 506). Here, defendant's postconviction petition did not include arguments concerning the timeline of events, the failure of trial counsel to challenge the reliability of the DNA evidence, and whether the State laid a proper foundation for computer-generated business records. Accordingly, these issues are forfeited, and we are without authority to grant him relief. 725 ILCS 5/122-3 (West 2022); *Jones*, 213 Ill. 2d at 506; *Reed*, 2014 IL App (1st) 122610, ¶ 43.

¶ 34     Turning to the merits, we begin by noting the familiar principles regarding postconviction proceedings. The Act "provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial." *People v. Robinson*, 2020 IL 123849, ¶ 42. A postconviction petition is not an appeal from the conviction, but a collateral attack on the trial court proceedings. *People v. Tate*, 2012 IL 112214, ¶ 8.

¶ 35     The Act sets forth a three-stage process for adjudicating a postconviction petition. 725 ILCS 5/122-1 *et seq*. (West 2022). The trial court in this case dismissed defendant's petition at the

first stage, which is proper only if the petition is frivolous or patently without merit. *People v. Harris*, 224 Ill. 2d 115, 125-26 (2007). A petition is frivolous or patently without merit if it has "no arguable basis in either law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition based on indisputably meritless legal theories or fanciful factual allegations lacks an arguable basis in law or in fact. *Id*. At the first stage, we "take the allegations as true and construe them liberally." *People v. Allen*, 2015 IL 113135, ¶ 41. Although the threshold to advance to the second stage is low, the petition must present sufficient facts to show that the allegations are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). We review the court's first stage dismissal of defendant's petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 36    Defendant here argues that his *pro se* petition made a substantial showing of appellate counsel's ineffectiveness pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) for failure to raise the issue of lack of foundation for the admission of evidence from the Cell Hawk software used by Sergeant Bruening. See *People v. Mack*, 167 Ill. 2d 525, 531 (1995) (a claim of ineffective assistance of appellate counsel is cognizable under the Act). In its response brief, the State agreed that "this claim as to Cell Hawk lacking foundation on how it was maintained and calibrated was preserved for the instant appeal," but fails to present the gist of a constitutional claim. *Cf. id*. at 531-32 (finding that the doctrine of waiver should not bar consideration of an issue when the alleged waiver stems from incompetency of appellate counsel in failing to raise the issue on appeal). The State contends that Sergeant Bruening's testimony established Cell Hawk was accepted by the field and was proper for matching coordinates and times from existing cell phone records onto a map. The State further argues that defendant would not have received a different outcome at trial by excluding the Cell Hawk evidence given the other evidence that overwhelmingly established his guilt, including the DNA evidence, witness testimony, and his

confession to Smith that he committed the offenses.

¶ 37    A criminal defendant has the right to effective assistance of counsel on direct appeal. *People v. Ross*, 229 Ill. 2d 255, 269 (2008). Claims of ineffective assistance of appellate counsel are analyzed under the same two-pronged test set forth in *Strickland* as for ineffective assistance of trial counsel claims. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). To establish a claim of ineffective assistance on direct appeal, a defendant must demonstrate that appellate counsel engaged in deficient conduct and that this conduct prejudiced the defendant. *Hodges*, 234 Ill. 2d at 17 (citing *Strickland*, 466 U.S. at 687-88). At the first stage of postconviction proceedings, the defendant need allege sufficient facts to show only that it was arguable that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced. *Id*. The defendant must demonstrate both prongs, and if a defendant cannot establish one prong, the court may deny the claim on that basis alone. *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996); *People v. Williams*, 2020 IL App (1st) 162512, ¶ 83. When a defendant alleges ineffective assistance of counsel for failure to make a certain claim on direct appeal, the reviewing court must analyze the underlying claim to determine if it is meritorious. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Unless the underlying issue is meritorious, a defendant suffers no prejudice from appellate counsel's failure to raise an issue on direct appeal. *Id*. Appellate counsel need not raise every conceivable claim on direct appeal and cannot be found ineffective for failing to raise a non-meritorious issue. *People v. Wesley*, 2019 IL App (1st) 170442, ¶ 20. "Appellate counsel's assessment of what to raise and argue will not be questioned unless it was patently wrong." *People v. Richardson*, 189 Ill. 2d 401, 412 (2000).

¶ 38    In assessing whether the underlying claim is meritorious for ineffective assistance of trial counsel, defendant must overcome a "strong presumption" that counsel's conduct falls within the

wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. *Strickland*, 466 U.S. at 697; *People v. Evans*, 186 Ill. 2d 83, 93 (1999). " 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *Sanchez*, 169 Ill. 2d at 487 (quoting *Strickland*, 466 U.S. at 691). Mindful that we are reviewing the trial court's dismissal of a first stage postconviction petition, we must determine whether it is arguable that defendant's ineffective assistance of trial counsel claim would have been successful if raised on direct appeal. *Childress*, 191 Ill. 2d at 175.

¶ 39    Trial counsel's decision of "[w]hether to object to matters such as foundation for evidence is, by and large, a matter of trial strategy." *People v. Probst*, 344 Ill. App. 3d 378, 387 (2003); see also *People v. Diaz*, 377 Ill. App. 3d 339, 349-50 (2007) (holding counsel's failure to object to lack of foundation for the horizontal gaze nystagmus test was a matter of trial strategy). Here, defendant cannot overcome the strong presumption that counsel's inaction was the product of sound trial strategy. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). The record is consistent with a strategic recognition that any attempt to elicit further details of Sergeant Bruening's historical cell-site analysis would only have further bolstered his testimony, highlighted the meticulousness of the police's investigation, and reinforced the fact that defendant's cell phone was approximately located at the Spring Hill Mall at the time the offenses were committed. Thus, defendant has failed to show that appellate counsel performed deficiently. Applying *Strickland* to defendant's contention under postconviction proceedings, it is not arguable that appellate counsel was objectively unreasonable by failing to challenge trial counsel's strategic decision to not object to the State's evidence rendered from the Cell Hawk software for lack of foundation. Thus, defendant has failed to establish that appellate counsel engaged in deficient conduct under *Strickland*.

¶ 40 Finally, assuming *arguendo* that appellate counsel's performance was deficient, we find defendant was not prejudiced as the result of the alleged error. The record is replete with evidence that defendant was at the scene of the crime at the time of its occurrence, bolstered, among other things, by the presence of his DNA, witness testimony, video evidence, cell phone records, and his admission to Smith that he committed the offenses when he specifically told her, "Oh shit, it was me and my buddy." Here, defendant cannot demonstrate prejudice from counsel's allegedly deficient performance when other independent evidence sufficiently supports the jury's verdict. In short, there is not a reasonable probability that, but for counsel's alleged unprofessional error, the result of the proceeding would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 30 (citing *Strickland*, 466 U.S. at 688, 694); see also *Sanchez*, 169 Ill. 2d at 487 (finding that an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment).

¶ 41 For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 42 Affirmed.